EUGENE LEITENSDORFER AND JOAB HOUGHTON, PLAINTIFFS IN ERROR, *v.* JAMES J. WEBB.

When New Mexico was conquered by the United States, it was only the allegiance of the people that was changed; their relation to each other, and their rights of property, remained undisturbed.

The executive authority of the United States properly established a provisional Government, which ordained laws and instituted a judicial system; all of which continued in force after the termination of the war, and until modified by the direct legislation of Congress, or by the Territorial Government established by its authority.

A suit brought in a court established by the provisional Government was properly transferred to a court created by the act of Congress establishing the Territory of New Mexico, the jurisdiction of which was fixed by a Territorial statute.

The laws of the provisional Government authorized an attachment against the property of a debtor, in cases in which a party claiming to be a creditor, upon a petition and affidavit, charged that his debtor had fraudulently disposed of his property, so as to hinder, delay, or defraud, his creditors. By the same law, an issue was directed to be tried upon the petition and affidavit of the plaintiff; upon which issue, if the finding sustained the petition and affidavit, the plaintiff was authorized to proceed to the proof of his debt; if the finding was against the charge in the petition, the attachment was to be dismissed. These proceedings with reference to the attachment are in their nature proceedings in abatement, and are not final as to the rights of the parties, and therefore cannot be reviewed upon writ of error in this court.

THIS case was brought up, by writ of error, from the Supreme Court of the Territory of New Mexico.

The facts of the case are stated, in the opinion of the court.

It was argued by *Mr. Cushing* and *Mr. Gillet* for the plaintiffs in error, and by *Mr. Polk* for the defendant.

The counsel upon both sides argued the case upon its merits; but as it went off upon a question of pleading, these arguments are omitted.

Mr. Justice DANIEL delivered the opinion of the court.

This case is brought before this court upon a writ of error to the Supreme Court of the Territory of New Mexico.

Upon the acquisition, in the year 1846, by the arms of the United States, of the Territory of New Mexico, the civil Gov-. ernment of this Territory having been overthrown, the officer, General Kearney, holding possession for the United States, in virtue of the power of conquest and occupancy, and in obedience to the duty of maintaining the security of the inhabitants in their persons and property, ordained, under the sanction and authority of the United States, a provisional or temporary Government for the acquired country. By this substitution of a new supremacy, although the former political relations of the inhabitants were dissolved, their private relations, their rights vested under the Government of their former allegiance, or those arising from contract or usage, remained in full force and unchanged, except so far as they were in their nature and character found to be in conflict with the Constitution and laws of the United States, or with any regulations which the conquering and occupying authority should ordain. Amongst the consequences which would be necessarily incident to the change of sovereignty, would be the appointment or control of the agents by whom and the modes in which the Government of the occupant should be administered—this result being indispensable, in order to secure those objects for which such a Government is usually established.

This is the principle of the law of nations, as expounded by the highest authorities. In the case of The Fama, in the 5th of Robinson's Rep., p. 106, Sir William Scott declares it to be "the settled principle of the law of nations, that the inhabitants of a conquered territory change their allegiance, and their relation to their former sovereign is dissolved; but their relations to each other, and their rights of property not taken from them by the orders of the conqueror, remain undisturbed." So, too, it is laid down by Vattel, book 3d, cap. 13, sec. 200, that "the conqueror lays his hands on the possessions of the State, whilst private persons are permitted to retain theirs; they suffer but indirectly by the war, and to them the result is, that they only change masters." In the case of the United States v. Perchiman, 7 Peters, pp. 86, 87, this court have said: "It may be not unworthy of remark, that it is very unusual, even in cases of conquest, for the conqueror to do more than to displace the sovereign, and assume dominion over the country. The modern usage of nations, which has become law, would be violated, and that sense of justice and right which is acknowledged and felt by the whole civilized world would be outraged, if private property should be generally confiscated and private rights annulled. The people change their allegiance; their relation to their sovereign is dissolved; but their relations to each other,

and their rights of property, remain undisturbed." (*Vide* also the case of Mitchel *v.* The United States, 9th ib., 711, and Kent's Com., vol. 1, p. 177.)

Accordingly we find that there was ordained by the provisional Government a judicial system, which created a superior or appellate court, constituted of three judges; and circuit courts, in which the laws were to be administered by the judges of the superior or appellate court, in the circuits to which they should be respectively assigned. By the same authority, the jurisdiction of the Circuit Courts to be held in the several counties was declared to embrace, 1st, all criminal cases that shall not be otherwise provided by law; and, 2d, exclusive original jurisdiction in all civil cases which shall not be cognizable before the prefects and alcaldes. (*Vide* Laws of New Mexico, Kearney's Code, p. 48.) Of the validity of these ordinances of the provisional Government there is made no question with respect to the period during which the territory was held by the United States as occupying conqueror, and it would seem to admit of no doubt that during the period of their valid existence and operation, these ordinances must have displaced and superseded every previous institution of the vanquished or deposed political power which was incompatible with them. But it has been contended, that whatever may have been the rights of the occupying conqueror *as such*, these were all terminated by the termination of the belligerent attitude of the parties, and that with the close of the contest every institution which had been overthrown or suspended would be revived and re-established. The fallacy of this pretension is exposed by the fact, that the territory never was relinquished by the conqueror, nor restored to its original condition or allegiance, but was retained by the occupant until possession was matured into absolute permanent dominion and sovereignty; and this, too, under the settled purpose of the United States never to relinquish the possession acquired by arms. We conclude, therefore, that the ordinances and institutions of the provisional Government would be revoked or modified by the United States alone, either by direct legislation on the part of Congress, or by that of the Territorial Government in the exercise of powers delegated by Congress. That no power whatever, incompatible with the Constitution or laws of the United States, or with the authority of the provisional Government, was retained by the Mexican Government, or was revived under that Government, from the period at which the possession passed to the authorities of the United States.

Among the laws ordained by the provisional Government of New Mexico is one conferring upon creditors the right of pro-

*Leitensdorfer et al. v. Webb.*

ceeding by attachment in certain cases against their debtors, and prescribing the instances in which, and the modes by which, this remedy may be prosecuted.

This law is contained in what is called the Kearney Code, at p. 39, and is found under the title Attachments. Upon its provisions, the case under consideration was instituted; and those provisions, so far as they are pertinent to the questions before us, will now be examined.

By section 1st, it is declared that creditors, whose demands amount to fifty dollars or more, may sue their debtors in the Circuit Court by attachment in the following cases, to wit:

"1st. When the debtor is not a resident of this Territory.

"2d. When the debtor has concealed himself or absconded, or absented himself from his usual place of abode in this Territory, so that the ordinary process of law cannot be passed upon him.

"3d. When the debtor is about to remove his property or effects out of this Territory, *or has fraudulently concealed or disposed of his property or effects*, so as to *hinder, delay,* or *defraud* his creditors."

It is under the third clause only of this first section of the attachment law, that this case has been or could have been instituted; since, by a recurrence to the affidavit made by the plaintiff in the attachment, it will be found to state, that Leitensdorfer & Co. *have* fraudulently disposed of their property and effects. By the second section of this law it is declared, that a creditor, wishing to sue his debtor by attachment, shall file in the clerk's office of the Circuit Court a petition or other lawful statement, with an affidavit of his cause of action, and a bond, with a condition to the latter to prosecute his action with effect, and without delay, and to refund all sums of money that may be adjudged to the defendant, and to pay all damages that may accrue to any defendant or garnishee, by reason of the attachment, or any process or judgment thereon.

The third section of this same statute provides, that the affidavit made by the plaintiff shall state that the defendant is justly indebted to the plaintiff, after allowing all just discounts, in a sum to be stated in the affidavit, and on what account; and shall also state that the affiant has good reason to believe, and does believe, the existence of one or more of the causes which, according to the provision of the first section, will entitle the plaintiff to sue by attachment. (See collection of the Laws of New Mexico, comprising the Kearney Code, p. 39.)

With the requisites of the aforegoing provisions of the statute, it appears, by the record, that the plaintiff below, the defendant in error here, formally and regularly complied.

The sixteenth section of the statute enacts, that "in all cases when property or effects shall be attached, the defendant may, at the court to which the writ is returnable, put in his answer without oath, denying the truth of any material fact contained in the affidavit; to which the plaintiff may reply. A trial of the truth of the affidavit shall be had at the same term; and on such trial, the plaintiff shall be held to prove the existence of the facts set forth in the affidavit, as the ground of the attachment; and if the issue shall be found for him, the cause shall proceed; but if it be found for the defendant, the cause shall be dismissed at the costs of the plaintiff."

At the October term, 1849, of the Circuit Court of the Territory, established by the Kearney Code, the defendants in the attachment appeared and filed a demurrer to the petition, and at this point terminated the proceedings had in this cause in the court last mentioned. By subsequently tendering and joining in an issue in the District Court of the Territory, in bar of the plaintiff's right of recovery, the defendants must be considered as having waived the demurrer interposed by them in the Circuit Court of the provisional Government, and there appears not to have been a joinder in the demurrer, nor any order whatever taken with respect to it.

On the 9th day of September, 1850, was approved the act of Congress establishing the Territorial Government for the Territory of New Mexico. (*Vide* Stat. at Large, vol. 9, p. 446.) By this act, commonly distinguished as the Organic Law, the legislative and judicial powers of the Territorial Government are provided and defined, to have effect from the passage of that act. The former, (the legislative power,) *vide* sec. 7, it is declared, shall extend to all rightful subjects of legislation not inconsistent with the Constitution of the United States and the act of Congress above mentioned. The latter, (the judicial power,) *vide* sec. 10, shall be vested in a Supreme Court, in District Courts, and in justices of the peace. That the Supreme Court shall consist of a chief justice and two associate justices, any two of whom shall form a quorum; that the said Territory shall be divided into three judicial districts, and a District Court shall be held in each of said districts by one of the justices of the Supreme Court, at such time and place as shall be prescribed by law. And it is further declared, that the jurisdiction of the several courts, as therein provided for, both appellate and original, and that of the justices of the peace, shall be as limited by law.

On the 19th day of September, 1851, the District Court of the United States for the first judicial district, created by the act of Congress, being then in session, the plaintiff in the attach-

ment moved the court for leave to file therein the papers and proceedings in that case, and that the same might be made a part of the records of the District Court; and it was thereupon ordered by the court, that the case be entered upon its docket. Objection was made by the defendants to the transfer of this case from the Circuit Court of the provisional Government, (*vide* Kearney Code,) to the District Court created by Congress, upon the ground that the Legislative Assembly had no power to authorize such a transfer. This objection was overruled by the District Court, and exception was taken to its decision.

Afterwards, viz: on the 25th of March, 1852, the defendants in the attachment so far submitted themselves to the jurisdiction of the District Court, as to plead to the averments in the petition and affidavit, and to pray judgment of the action, because they say that at the time of the institution of the suit, viz: on the 30th day of July, 1849, the defendants had not fraudulently disposed of their property, so as to hinder, delay, and defraud their creditors. And again, at the same, term of the said District Court, the defendants, upon affidavits made by them of the insufficiency of the sureties in the bond filed by the plaintiff in the attachment, applied for and obtained from that court an order for further security, which security was, upon the said application and order, given by the plaintiff.

On the 1st day of October, 1852, this cause was, upon the petition and affidavit, the plea of the defendants, and the evidence produced by the parties, submitted to a jury, who found that the affidavit of the plaintiff was true; whereupon it was considered and ordered by the court that the cause should proceed, and that the defendants should plead to the merits of the plaintiff's demand; and the defendants having pleaded that they did not promise and undertake as the plaintiff had charged them, and upon this last issue the cause having been committed to a jury, they found for the plaintiff, and assessed his damages at ten thousand three hundred and thirty dollars and twenty-five cents. After the finding of the juries upon both the issues in this case, motions were made, first for a new trial, and secondly for an arrest of judgment, both of which motions were overruled. As these were motions submitted to the discretion of the court, and determined by it upon facts and circumstances not fully disclosed upon this record, it would be improper in this court, and in conflict with its settled rule of action, to overrule or even to canvass the decision of the court which overruled these motions.

In the objection which was taken to the power of the Legislative Assembly to transfer the cognizance of causes previously pending under the laws of the provisional Government to the

courts created by the act of Congress establishing the Territory of New Mexico, we can perceive no force. It was, undoubtedly, within the competency of Congress either to define directly, by their own act, the jurisdiction of the courts created by them, or to delegate the authority requisite for that purpose to the Territorial Government; and by either proceeding, to permit or to deny the transfer of any legitimate power or jurisdiction previously exercised by the courts of the provisional Government, to the tribunals of the Government they were about to substitute for the Territory, in lieu of the temporary or provisional Government. This power we consider was, in fact, delegated by Congress to the Territorial Government by the seventh section of the act of 1850, which declares, that "the legislative power of the Territory shall extend to all rightful subjects of legislation consistent with the Constitution of the United States and with this act;" and by the tenth section of the act, which, after ordaining a Supreme Court, District and Probate Courts, and justices of the peace, and after dividing the Territory into three judicial districts, and directing a District Court to be held in each district, by one of the judges of the Supreme Court, goes on to declare, that "the jurisdiction of the several courts therein provided for, both appellate and original, and that of the Probate Courts, and of justices of the peace, shall be as limited by law."

The inquiry regularly suggested by these provisions of the act of Congress, is not whether they invested the Legislative Assembly with authority to prescribe the subjects for the cognizance of the courts created by that act—of this there can be no doubt—but whether the authority delegated to that Assembly has been *in fact*, and *to what extent*, exerted with reference to controversies previously in litigation in the courts of the provisional Government, and to subjects of controversy subsequently arising.

Under the provisions of the act of Congress above quoted, the Legislative Assembly have, in several instances, prescribed the powers and duties of the Territorial courts, and, among others, by the fourth section of the act of that Assembly, passed on the 12th of July, 1851; by which section it is declared, that the *District* Courts shall have original jurisdiction in all cases, civil and criminal, in which the jurisdiction is not specially delegated to some other court; and by the second section of the act of the Assembly, approved on the 14th of July, 1851, expressly providing, "that all bonds, writs, and processes, which have remained in force, shall be carried to a final decision in the courts established by the Legislative Assembly, *to the same effect* as they would have been in the courts previously existing."

As the Legislative Assembly possessed no power to organize or create courts differing from those created by the act of Congress, which act had divided the Territory into districts, and had designated the courts which should be vested either with appellate or original jurisdiction, it would seem to follow that, by an act of the Legislative Assembly, designed to preserve, and to prevent the discontinuance of rights in litigation subsisting in the courts of the provisional Government, the distribution of the cognizance of those rights was intended to be made to courts corresponding in their jurisdiction with the tribunals of the provisional Government.

Such appears to have been the interpretation, by the judges of the Supreme Court of the Territory, of the acts of the Legislative Assembly, and by which interpretation they have recognised the transfer of causes pending in the Circuit Courts of the provisional Government, for final decision, to the *District* Courts under the Territorial Government; and although there is some obscurity in the language of the Territorial statutes on this subject, yet the reasonableness of their interpretation by the Supreme Court and the District Courts of the Territory commends it to our approval, and its adoption conforms to the rule of this court, by which it has followed the construction of local statutes established by the highest judicial authority of the community for whose government they are enacted.

At the trial of the issue joined upon the verity and effect of the affidavit, the plaintiff in the attachment, to maintain that issue, on his part, produced in evidence and proved the execution of an assignment, by which Leitensdorfer had conveyed all his goods, wares, and merchandise, and all his property and effects, of the late firm of Leitensdorfer & Co. Also, an instrument executed at the same time, by Joab Houghton, the other member of the firm, whereby he authorized the assignees of Leitensdorfer & Co. to use and sign his name in any way that it might be necessary for them to use it in settling the business of the late firm of Leitensdorfer & Co. By the deed from Leitensdorfer, certain creditors to the amount of between twenty and thirty thousand dollars were preferred, besides all sums of money due by Leitensdorfer & Co. for simple deposits or money loaned without interest; after which, the general creditors were to be paid *pro rata*, from whatever might be collected, until the assets should be exhausted. There was no inventory of assets, nor any schedule of debts due by said Leitensdorfer, attached to or accompanying the deed of assignment. The deed provided that a fair and correct list of the liabilities of Leitensdorfer & Co., and also a fair list, so far as could be made, of all the assets, was to be made within ten

days after signing the deed; within this period, an inventory of assets was made out, but no list of liabilities. Some persons, whose names were not in the assignment, who had deposited with or loaned money without interest to the firm, were paid by the assignees, and the deed was not pursued in other respects. Upon the closing of the testimony on the trial in the District Court, the defendants, the now plaintiffs in error, moved the court for the following instructions to the jury, all of which were refused:

1. That as the assignment was the act of Leitensdorfer alone, with which Houghton had nothing to do, the act of one defendant would not authorize an attachment against two, and the verdict must be for the defendants.

2. That the deed of assignment was not fraudulent in law; and unless the jury find, from the evidence, that in fact, at the time of the commencement of this suit, the plaintiff had good reason to believe that the defendants had fraudulently disposed of their property and effects, so as to hinder, delay, and defraud their creditors, they must find for the defendants.

3. That as the plaintiff had shown no title to the note sued on in himself, he had no authority to sue, and the jury must find for the defendants.

The court then instructed the jury that the deed was fraudulent in law, because of the want of a schedule thereunto annexed of the property and effects conveyed to the assignees, and because of the want of a schedule of the preferred creditors, and because of a preference of some creditors; and also, if the jury found that the defendants, or either of them, had fraudulently disposed of their property and effects, so as to hinder, delay, or defraud their creditors, at the time of the commencement of this suit, they must find for the plaintiff. That the execution of the deed by Leitensdorfer, unaccompanied by the proper schedules, was a fraudulent disposition in law, as aforesaid; and that the commission of a fraud *in law* by the defendants, or either of them, without fraud in *fact*, or without an intent to defraud, was a sufficient cause for the attachment as the commission of a fraud in fact, or with intent to defraud. And also, that upon the trial of this issue it was not necessary for the plaintiff to show himself a creditor of the defendants, farther than is shown in the affidavit, to entitle him to a verdict in his favor upon the issue of the truth of the affidavit; but that the sole issue was, whether the defendants, or either of them, at the time of the commencement of the suit, had fraudulently disposed of their property and effects, so as to hinder, delay, or defraud their creditors.

Upon the refusal by the court of the first, second, and third

prayers presented by the defendants, and to the granting of the instructions prayed for by the plaintiff below, the defendants excepted.

Upon the trial of the issue joined on the plea in bar to the action, no question of law was raised, no exception taken to any of the proceedings under that issue.

On an appeal from the judgment of the District Court to the Supreme Court of the Territory of New Mexico, the judgment of the District Court was, on the 28th of February, 1853, affirmed.

It is obvious, that in the proceedings in the District Court, neither the justice nor the amount of the plaintiff's demand was put in controversy. These were not embraced within the issue raised upon the petition and affidavit. That issue related only to the right of the plaintiff to sue in a particular form of action, a right dependent upon his ability to show the alleged character of the defendants' acts, with respect to their creditors generally, and not with respect to the plaintiff particularly or exclusively. The verity and the amount of the plaintiff's demand were matters for distinct and ulterior investigation. The proceeding, then, upon the petition and affidavit, was in reality a proceeding in abatement, and not in bar of the plaintiff's debt or right of recovery. This appears to be a regular conclusion from the language of the law of the Territory, and it is in accordance with the construction by the courts of a neighboring State of a law identical in its provisions with the law of the Kearney Code, and from which law it is not improbable that the latter was adopted. (*Vide* Missouri Reports, vol. 5, p. 544; ib., 13, p. 118; ib., 14, p. 600; ib., 15, p. 499.)

It is true, that by the practice of the State courts the preliminary proceedings upon the petition and affidavit, and any questions of law ruled by the courts in those proceedings, are carried for review to the tribunals of last resort. But this is a practice authorized by the States under their peculiar jurisprudence. The States possess an undoubted power to permit or to require of their courts the re-examination and control of proceedings in their own tribunals, entirely interlocutory in their nature. The appellate or revisory power of this court, as defined by the Constitution and laws of the United States, is more restricted in its extent than that with which some of the States have invested their courts. By the twenty-second section of the act of Congress to establish the judicial courts of the United States, it is declared that *final* judgments and decrees in civil actions and suits in equity in a Circuit Court, brought there by original process, or removed there from the courts of the several States, or from a District Court, where the matter in

dispute exceeds the sum or value of two thousand dollars, exclusive of costs, may be examined, and reversed or affirmed, in the Supreme Court. But there shall be no reversal for error in ruling any plea in abatement other than a plea to the jurisdiction of the court, or such plea to a petition or bill in equity, as is in the nature of a demurrer.

From this provision in the act of Congress it follows, that the preliminary proceeding in the District Court of the Territory, being in its nature interlocutory, and designed to abate the particular remedy by attachment only, and having no application to the plaintiff's right to a recovery of his demand, or to the jurisdiction of the Territorial court, either as to the parties or the subject-matter of the controversy, that proceeding comes not within the appellate or revisory power of this court.

Upon the trial in chief, or upon the merits, there appears to have been no question made, nor any point reserved upon the law or the evidence; the record of this trial presents simply the finding of the jury, and the judgment of the District Court upon that finding. The decision of the Supreme Court of the Territory in sustaining the judgment of the District Court must therefore be affirmed.