GEORGE P. MURRELL *v.* EDWARD P. JONES *et al.*

1. BILLS OF EXCHANGE: POSSESSION OF, PRIMA FACIE EVIDENCE OF OWNERSHIP.— Possession of a bill of exchange, indorsed in blank by the payee, is *primâ facie* evidence of ownership, and of full authority to sell or dispose of; and a *bonâ fide* purchaser of such a bill will not be affected by any violation of duty or excess of authority on the part of an agent to whom the same is indorsed.

2. SAME: SEALED INSTRUMENTS.—By the commercial law, sealed instruments are not regarded as commercial paper; by statute in this State, they are placed on the same footing as bills of exchange and promissory notes.

3. PRINCIPAL AND AGENT: IMPLIED REVOCATION OF AGENT'S AUTHORITY.—Where a party resident in Mississippi, a short time before the fall of the city of New Orleans, intrusted certain bills of exchange to an agent to sell, which after the surrender were sold for Confederate money. Held—That the surrender of the city did not revoke the agent's authority.

4. CHANCERY PLEADING: FRAUD: EVIDENCE.—Inconsistent and contradictory statements in a bill in chancery are not evidence, unsupported by other proof, of moral fraud or fraud in law.

5. CHANCERY PLEADING: DEMURRER TO BILL ON ACCOUNT OF CONTRADICTORY STATEMENTS.—A special demurrer will lie to a bill in chancery, which is incon-

sistent and contradictory in its statements, and the court will compel the complainant to elect on which position he will rely.

6. PRINCIPAL AND AGENT: IMPROPER ACTS OF AGENT WILL NOT AFFECT RIGHTS OF PURCHASER.—If an agent acts unwisely or faithlessly, that will not affect the title of a party purchasing from such agent, unless it be shown that the purchaser has been guilty of some fraudulent conduct himself.

7. INTERNATIONAL LAW: RELATION OF CITIZENS OF CONFEDERATE STATES TO THE GOVERNMENT OF THE UNITED STATES DURING THE WAR.—Persons resident within the limits of the Confederate States during the existence of the war, whether loyal or not to the government of the United States, were regarded by the government of the United States as enemies. *Hill* v. *Boylan*; Mrs. Alexander's Cotton, 2 Wallace.

8. INTERNATIONAL LAW: LAWS OF UNITED STATES NOT IN FORCE IN CONFEDERATE STATES.—The laws of the United States, during the existence of the war, were not operative within the limits of the Confederate States, either for protection or punishment.

9. INTERNATIONAL LAW: RELATION OF CITY OF NEW ORLEANS TO UNITED STATES FROM TIME OF SURRENDER TO 6TH MAY, 1862.—The city of New Orleans, from the time of its surrender until the 6th day of May, 1862, the date of Butler's order assuming command, was an enemy's port, and the military occupation of the city, up to the 6th of May, 1862, by the Federal army, was not sufficient in duration or character to change the enemy relation, which existed between its citizens and those of the United States, or to bring the city within the operation of the Constitution and laws of the United States. 2 Wallace R. 135, 258.

10. SAME: SAME.—The laws in force in the city of New Orleans, at the time of its surrender, remained in force until the 6th day of May, 1862, as they did immediately before the conquest, except so far as they had been abolished or changed by the conqueror.

11. SAME: CONQUEST, EFFECT UPON THE LAWS OF THE CONQUERED: MILITARY OCCUPATION.—The laws of a conquered or ceded territory remain in force until altered by the new sovereign; and during the period of military occupation, the military commander has the right to ordain laws to operate over the conquered territory, and to continue in force until altered by the proper legislative power. 9 Peters, 734–748; 20 How. U. S. R. 106; Cowper, 204; *Scott* v. *Billgerry.*

12. CONTRACTS: CONSIDERATION: CONFEDERATE MONEY.—A contract, founded on the consideration of Confederate money, and made in the city of New Orleans, after its surrender to the Federal army, and prior to the 27th May, 1862, the date of the military order prohibiting its circulation, is not illegal and void.

13. COMITY BETWEEN STATES: DECISION OF STATE COURTS WHEN BINDING.—The decisions of the courts of a State, expounding its own local laws, are binding upon the courts of other States; but *quere*, where the decision of the State court involves a question of the public policy of the United States, under the Federal Constitution and laws. 11 Peters R. 1 ; 16 Ib. 367–369.

14. BILLS OF EXCHANGE: ASSIGNMENT BY WHAT LAW GOVERNED.—An assignment of negotiable paper, as a general rule, must be made in conformity to the law of the place where the assignment is made.

15. SAME: SAME: WHERE NOTE SECURED BY MORTGAGE ON REAL ESTATE.—An
assignment of a promissory note, or bill of exchange, secured by mortgage on
real estate situated in this State, made in conformity to the laws of this State but
not in accordance with the law of the State where made, will entitle the assignee
to his remedy on the mortgage in the courts of this State.  9 S. & M. 544.

16. CONTRACTS: VALIDITY OF, BY WHAT LAW DETERMINED.—The validity of every
contract depends on the laws in existence at the time it was made, and cannot be
affected by subsequent changes in law or policy.

APPEAL from the Chancery Court of Sunflower county.  Hon.
Wm. Cothran, chancellor.

The facts of the case are fully stated in the opinion of the court.

*Thomas Walton*, for appellant.

*J. Z. Gornge*, for appellee.
The argument of counsel too lengthy for insertion.

ELLETT, J., delivered the opinion of the court.

The appellant filed his bill in this cause, in the Chancery
Court of Sunflower county, against Edward P. Jones, and the
representatives of Alexander Yuille, deceased, to enforce an
equitable mortgage on a tract of land in that county.  The bill
shows that Jones conveyed the tract to Yuille, by deed dated
June 8, 1859, executed in the said county, and that in the deed
he reserved a lien on the land, as security for the payment of
the notes given for the purchase-money.  These notes, or bills
single, are alleged to have been executed at the same time and
place with the deed, and to have been three in number, each
for the sum of $10,666.66⅔; the first of which has been paid.
The other two fell due, respectively, January 1, 1861, and 1862,
and are the subjects in litigation.  These notes are under seal,
and are not dated or made payable at any particular place.

The bill charges that the defendant, Jones, on the third
day of May, 1862, indorsed the two last-mentioned bills single
in blank, and sold and delivered the same for value received,
unto the complainant, through his agent A. J. Rugely & Co.,
complainant paying said A. J. Rugely & Co. $24,000 in Con-
federate treasury notes therefor, the same then being the full
value of said bills single.  That said sale was made in the city of
New Orleans, on the 3d of May, 1862, six days after the same

city was evacuated by the Confederate States troops and the occupation by the Federal troops, but while the circulation of said Confederate treasury notes was still permitted by the Federal authorities, and was still going on.

After setting forth various pretenses of the defendants, the bill goes on to state, that at the time when said purchase of said bills single was made by complainant, Confederate notes or money was worth in New Orleans more in gold than the treasury notes of the United States, which are a legal tender to pay debts, are worth; and that Confederate money or notes were at that time the only currency of the city of New Orleans, that place having only been occupied by the troops of the United States for the space of six days, and the commanding general having refused to forbid the circulation of that currency, and on the contrary having ordered that said money be continued in circulation, which orders were in operation at the time complainant bought said bills single. That the said Jones was in the city of New Orleans in the latter part of April, 1862, and just before the occupation of the city by the United States forces, and then and there authorized said A. J. Rugely & Co. to receive from C. Tate & Dupuy, Confederate money or bank bills, and authorized C. Tate and Dupuy to pay Confederate money or bank bills on said notes, and said Jones moreover ratified said sale of said notes after it was made, and he was informed thereof. That said A. J. Rugely & Co. were merchants and traders in New Orleans, who, among other kinds of business, practiced a general business in the negotiation and sale of commercial paper, and they being general agents of their customers for that purpose, the said Jones indorsed the said bills single in blank, and left them with the said A. J. Rugely & Co., and that the said A. J. Rugely & Co. sold them to complainant, who had no notice of any right to the said notes on the part of said Jones, or of any restrictions upon the discretion of A. J. Rugely & Co. in their sale, wherefore Jones is bound by the acts of the general agents aforesaid, whom he had thus enabled to dispose of the notes to complainant on their own terms, and who did sell them to complainant, as aforesaid, for their full value.

That A. J. Rugely & Co. were in possession of the said bills single, indorsed in blank as aforesaid, and claiming absolute authority and control of the same as of their own property, sold the same to complainant for their full value ; and that complainant did not know of any agency of said A. J. Rugely & Co. for said Jones, but believed the said A. J. Rugely & Co. to be entitled, as they claimed to be, to control said bills as their own. That Jones ought therefore to lose his rights to said bills single, even if Rugely & Co. had no authority to sell the same, as by his blank indorsement he enabled them to deceive complainant, and to represent themselves as entitled to sell the same as their own property.

That since that time said Jones has ratified such assumption of ownership and absolute control of said bills single, and such conversion of the same to their own use on the part of A. J. Rugely & Co. as appears by a letter filed as Exhibit D, in which Jones deals with said conversion by A. J. Rugely & Co. as raising a liability on their part to pay him the value of the same.

That whether said A. J. Rugely & Co. had authority or not to sell said bills single as aforesaid, yet said Jones led complainant to believe, by his assurances given to the agents of complainant, Calvin Tate & Dupuy, in New Orleans, that A. J. Rugely & Co. had authority to receive Confederate money, or bank bills, or any other kind of money at their discretion, for said bills single ; and that therefore complainant, acting upon these statements of said Jones, and without any suspicion of such alleged want of authority in A. J. Rugely and Co., bought the said bills single for their full value in the current money of the country at that time. That the money paid was worth $24,000, and was of as great an amount as the bills single.

The bill prays for a decree for the payment of the amount due, out of the personal assets of Alexander Yuille, in the hands of his administrator, and in default of such payment, for a sale of the land for that purpose.

The defendant, Jones, put in a separate demurrer to the bill, relying on two grounds :

1. That the assignment of the bills single was made in the state of Louisiana, after its occupation by the United States forces, and when the city and the parties were under the jurisdiction of the United States, and that the assignment was made for Confederate treasury notes, and was therefore illegal and void, both by the laws of the United States, and by the laws of the state of Louisiana.

2. That the assignment was made by A. J. Rugely & Co. in fraud of the rights of said Jones, and that complainant had notice of that fact, or reasonable ground to put him on inquiry.

This demurrer was allowed by the court below, and the bill dismissed. Hence this appeal.

It is argued in the first place, on the part of the appellee, that, by the case as stated in the bill of complaint, it appears that A. J. Rugely & Co. had no authority to sell the bills single in controversy, for any purpose whatever.

The possession of the bills, with the blank indorsement of Jones, was *primâ facie* evidence of ownership, and of full power to sell and dispose of them at discretion, and ordinarily the *bonâ fide* purchaser of a bill or note will not be affected by any violation of duty or excess of authority, on the part of the agent, of which he has no knowledge. The demurrer admits the truth of the averments of the bill, and we are unable to perceive anything that would justify the inference that Rugely & Co. had no authority to make the sale of the bills to the complainant.

It is true that the transfer was made after their maturity. The effect of this generally, is to deprive the paper in a great degree of its commercial character. By the law-merchant, if a bill or note be transferred when overdue, the assignee takes it subject to all defenses that might have been made against the assignor, before the assignment. In such case the paper is already discredited; the assignee is put on his guard; and although he pays a full consideration for it, he receives nothing but the title and rights of his assignor. But in this respect he is in no worse a position than he would have been under our statute if the transfer had been made before the bills fell due. Sealed instruments are not commercial paper by the law-

Murrell v. Jones et al.

merchant. By our statute they are substantially put on the same footing with bills of exchange and promissory notes, but the anti-commercial principle is established in reference to them all; so that, even when assigned before maturity, the same rule prevails, and they are liable in the hands of the assignee, to all defenses existing before notice of the assignment. Conceding all this to be true, still the case discloses no equities between the original parties that would affect these bills single in the hands of the holder.

It is further insisted that complainant had actual knowledge of the fact that A. J. Rugely & Co. held the paper as agents for collection only, and not for sale, and that therefore his purchase was void. The averments of the bill are relied on to sustain this position, and particularly the passage in which it is stated that Jones, in the latter part of April, 1862, at New Orleans, authorized said Rugely & Co. to receive from C. Tate & Dupuy, Confederate money or bank bills, and authorized C. Tate & Dupuy to pay Confederate money or bank bills on said notes; and that Jones ratified the sale on being informed of it. This, it is urged, shows that the only authority of Rugely & Co., was to receive from Tate and Dupuy, and from them alone, Confederate money in payment and discharge of the bills single, and that complainant knew of the extent of the agency, at the time of the purchase.

There is nothing stated in this part of the bill to show the relevancy of these averments, or to connect the plaintiff with them in any manner. It is not shown here that Tate & Depuy were his agents, or that he had any knowledge of these facts at the time of his purchase of the paper. But in a subsequent part of the bill, it is alleged that Jones led complainant to believe, by his assurances given to the agents of complainant, C. Tate & Dupuy, that Rugely & Co. had authority to receive Confederate money for the bills single, and that complainant acting on these statements, and without any suspicion of the want of authority of Rugely & Co., bought them.

Taking the whole of these statements together, as they plainly relate to the same subject, it is evident that all the language

employed, though not very accurate or appropriate, had refer-
ence to a proposed sale of the paper by Rugely & Co. as agents
of Jones, and a purchase of it by complainant through Tate and
Dupuy, as his agents.    That a sale was made, and that Rugely
& Co. had authority to make it, are facts sufficiently alleged in
the bill, and they stand confessed by the demurrer.

Again, it is urged that, if A. J. Rugely & Co. had authority
at any time to sell the bills single, such authority had expired
when the sale was made.

In support of this position it is argued that, before the sale
was made, the city of New Orleans had fallen into the hands of
the enemy ; that the value of Confederate money was thereby
seriously impaired, and was liable to be further depreciated by
the events of the war; that Jones was a citizen of Mississippi,
and, after the fall of New Orleans, it was unlawful for him to
sell to complainant, either by himself or his agents ; that it was
impossible for him to receive the proceeds of the sale, and that
it was unreasonable that Jones should sell his securities with his
indorsement upon them, except for the sake of raising money for
immediate use, and, for all these reasons, that a revocation of
the authority of A. J. Rugely & Co. ought to be implied.

All these considerations, or any of them, may have been very
good reasons why Mr. Jones should have revoked the authority
of A. J. Rugely & Co., but they are not of the class of facts
that amount in law to an implied revocation, as death, the mar-
riage of a *feme sole,* and the like.    It is very easy to see, in the
light of subsequent events, that it would have been wise and
prudent in the principal to have withdrawn the authority, or in
the agent to have abstained from its exercise ; but it is impossi-
ble for us to tell how it may have struck the parties at the time.
The situation was before them for the exercise of their judgment
and discretion, and, having taken the risk of the transaction, it
would hardly do for this court to create an *ex post facto* revoca-
tion because, in the course of things, the operation had proved
disastrous.    As to the supposed illegality of the sale arising
from the enemy relation of the parties after the fall of New
Orleans, it is enough to say, that it by no means appears, by

Murrell *v.* Jones et al.

anything contained in this bill, that such a relation ever subsisted between them, as would render intercourse and trade between them unlawful.

It is further contended that the purchase of the bills single by the complainant was fraudulent, and therefore void.

The facts relied on to establish this proposition are : 1. The inconsistent and contradictory statements of the bill ; and 2. The time when the purchase was made.

The bill in one place alleges that Rugely & Co. claimed to be the owners of the bills single in their own right, and that complainant bought them without any notice that Jones had any right to them whatever ; and in another place that they were induced to purchase them by the assurances of Jones that Rugely & Co. had authority to receive Confederate or any other kind of money for them at their discretion. These statements are apparently contradictory, but it is not necessarily any evidence of fraud that a party in his pleading, puts his case upon different and inconsistent grounds. It must be either a moral fraud or a fraud in law. If the former, then it would be only evidence of intention, to be considered by the court, with other proofs upon final hearing ; if the latter, it must be so by virtue of some rule of law, that such a fault in pleading is *ipso facto* a fraud in law, for which the case of the guilty party must be dismissed from the court. In fact, it is neither a legal nor a moral fraud, and is perhaps only important for its violation of the rules of good pleading. At law, a party may, without animadversion, state his case in many different and seemingly repugnant forms, by resorting to different counts ; but such a mode of pleading does not accord with the plain and simple rules that obtain in courts of equity. Had the objection to the contradictory statements of this bill, been taken by a special demurrer, the court would no doubt have required the complainant to amend, and to elect on which position he would choose to stand. But the bill is not so fatally objectionable on that account, as to be liable to dismissal on a general demurrer on the ground of fraud.

But it is said that the complainant did not purchase the bills

single until after the fall of the city of New Orleans, and this is relied on as proof of the fraud. Unless the purchase, under such circumstances, was one of such a character as the law adjudges to be fraudulent, without reference to the motive and inten- tion of the parties, it cannot be pronounced a fraud on demur- rer to the bill. But of itself, it would not be evidence of fraud at all. If Rugely & Co. then had authority to sell, and com- plainant bought in good faith, all which is averred in the bill and admitted by the demurrer, it is difficult to see how fraud is to be predicated by the transaction. If the agents of Mr. Jones acted unwisely or faithlessly, that would not affect the title of complainant unless he was guilty of some fraudulent conduct himself. And this we are asked to presume, in oppo- sition to the averments of the bill, which in this proceeding are to be taken as true.

It is also insisted, and this seems to be the main point in the case, that the sale of these bills single was void, both by the laws of the United States, and of the State of Louisiana.

We have already decided, in the case of *Green* v. *Sizer*, at the present term, that an executory contract, entered into in the State of Mississippi, in the year 1862, where the considera- tion was paid in the treasury notes of the Confederate States, was not in violation of any law or policy of the United States, or of this State. We passed over the inquiry whether the ori- ginal issuance of these treasury notes by the Confederate States could be considered as in contravention of any law or policy of the United States, as a question not necessary to be decided; and rested our conclusion mainly on the well-established prin- ciple, expressly commended by the Supreme Court of the United States, in the case of *Armstrong* v. *Toler*, and by all approved writers on the subject—that where the contract does not grow immediately out of the original illegal act, but is unconnected with it, and is founded on a new consideration, such con- tract is not invalid, but will be enforced by the courts, notwith- standing the issuance of the treasury notes might have been wholly unlawful. We see no reason to be dissatisfied with that decision, and it disposes of a large portion of the argument of

the appellee in this case, leaving only so far as this point is concerned, the question whether the peculiar facts of this case exempt it from the operation of the rule there adopted.

The sale of these bills single took place in the city of New Orleans, on the 3d day of May, 1862, which, the bill states, was six days after the occupation of the city by the Federal troops ; and hence, it is insisted, that the contract was made within the jurisdiction of the United States, and is therefore void, whatever might be thought of contracts made at that time upon the same consideration, within the limits of the Confederate authority.

We have already shown in the case of *Hill* v. *Boylan*, at the present term, that, according to the repeated decisions of the Supreme Court of the United States, during the continuance of the late civil war, all the territory in the Confederate States, or at least so much of it as lay on the south of the line of military occupation by the forces of the United States, was enemy's territory, and that the constitutional powers of the government of the United States were suspended therein. In the prize cases, Judge Grier states the proposition contended for by one of the parties to be, " That the Constitution and laws of the United States are still operative over persons in all the States, for punishment as well as protection ;" and he proceeds to refute this pretension, in language that has been heretofore quoted by this court, and arrives at the conclusion that all persons residing within the States declared by the President to be in a state of insurrection, are enemies of the United States, not entitled to invoke the protection of its Constitution and laws ; and that all property belonging to such persons, captured on the high seas, is justly liable to condemnation as enemies' property. And in the case of Mrs. Alexander, it is adjudged that this enemy relation must continue until, by the action of the legislature and the executive, or otherwise, it becomes " thoroughly and permanently changed." In this latter case it was further held that the occupation of the country by Banks and his army for a period of six weeks was " too limited, too brief, too imperfect and too precarious," to change, even while it lasted, the enemy

relation previously created for the country and its inhabitants; and that Mrs. Alexander, a loyal citizen of the United States, having no sympathy or participation in the rebellion, had, by reason of her mere residence in this " enemy territory," forfeited the right guaranteed to every " citizen " by the Constitution and laws of the United States, to sue in the Federal courts. It being thus settled by the highest judicial tribunal that the Constitution and laws of the United States were not operative in the Confederate States, either for punishment or protection, and that loyal citizens of the United States, residing within the limits of the Confederate States, had no standing in any court of the Union, it would seem very clear that the citizens of the Confederate States were not bound, in their individual transactions, to respect the laws or policy of a government that thus spurned the allegiance of those who had kept their loyalty to it, and repudiated its duty of protection. The United States had no law or policy in force in the Confederate States during the war. They had been expelled by force, and were kept out by the same means, and the people were subjected to new laws and new policy, to which they had no option but to submit. The use of Confederate money became an absolute necessity of their condition, for without it they could neither live in the Confederacy nor make their escape from it. There were no other means of procuring food and clothing, and to hold that, in giving or receiving it, the people, in their then situation, were guilty of an offense against the paramount law, for which all their contracts are to be held null and void, would be a refinement of cruelty unworthy a civilized nation or an enlightened age.

But the question is, when was this state of things changed? When were the Constitution and laws of the United States restored to their operation in New Orleans? Had that restoration taken place on the third day of May, 1862?

It might well be questioned whether such restoration has yet occurred. Certainly, so far as regards the rights guaranteed to the citizens by the Constitution, it has not been restored. But has it been restored so as to impose its burdens and restrictions, its laws and its policy, upon the people; and had that been

done on the day when the contract in this case was made? The bill states that the occupation of the city by the Federal troops had taken place six days before the date of the contract. As matter of history, that is not exactly so. It is true, that on the 27th of April, two days after the advance of the Federal fleet reached the city, a party landed from a vessel of war, and raised the United States flag over the Mint. But nothing was done in the way of occupying the city until the 1st of May, when the debarkation of the troops was commenced, which was completed on the following day. On the 6th of May, the proclamation of Gen. Butler, dated May 1, was issued, in which he announced the occupation of the city, and promised protection to the property of foreigners, etc.

Now we have seen that the country is to be regarded as enemy country until that relation is "thoroughly and permanently changed;" and that an occupation of the Red River country for six weeks, was too limited, too imperfect, too brief, and too precarious for that purpose. Was, then, an occupation of one day, counting from the actual possession of the city by the troops, or of six days, counting from the raising of the first flag, when the city was brought under the guns of the fleet, sufficient, in the case of New Orleans, to change the enemy character of that place, to displace the municipal laws and regulations prevailing under the Confederate government, and to reëstablish the Constitution and laws of the United States? On this subject we are not left without a light to guide our path. In the case of *The Circassian*, 2 Wallace, 135, the question was, whether the Port of New Orleans was in a state of blockade on the fourth of May, 1862, the day when that vessel was captured. The argument for the claimants of the vessel was, that by the capture and occupation of the city, it ceased to be an enemy's port, and, therefore, that the blockade terminated on the 1st of May. Chief-Justice Chase said: "Now it may be well enough conceded that a continuous and complete possession of the city and port, and of the approaches from the Gulf, would make a blockade unnecessary, and would supersede it. But at the time of the capture of the Circassian,

there had been no such possession. Only the city was occupied, not the port, much less the district of country commercially dependent upon it, and blockaded by its blockade. Even the city had been occupied only three days. It was yet hostile; the rebel army was in the neighborhood; the occupation, limited and recent, was subject to all the vicissitudes of war. Such an occupation could not at once, of itself, supersede or suspend the blockade. It might ripen into a possession which would have that effect, and it did." Here then is an express adjudication that on the 4th of May, one day after the date of this contract, New Orleans was an enemy's port, liable to blockade, and actually blockaded; and that the occupation was not then sufficient, in duration or character, to change that relation, or to bring that city within the operation of the Constitution, laws, or commercial treaties of the United States.

The subject is further illustrated in the case of the *Venice*, 2 Wallace, 258. That vessel was captured on the 15th of May, and was claimed by a foreigner. The court, referring to the proclamation issued by Butler on the 6th of May, says: "We think that the military occupation of the city of New Orleans may be considered as substantially complete from the date of this publication (May 6); and that all the rights and obligations resulting from such occupation, or from the terms of the proclamation, may be properly regarded as existing from that time. * * * * Military occupation and control, to work this exception (that is, exemption from the blockade), must be actual; that is to say, not illusory, not imperfect, not transient; but substantial, complete, and permanent. Being such, it draws after it the full measure of protection to persons and property, consistent with a necessary subjection to military government."

These adjudications save us the trouble of any argument upon the subject, and fully establish the proposition, that on the 3d of May, 1862, New Orleans was enemy territory to the United States, that its inhabitants were enemies, that they were not entitled to the protection of the Constitution and laws of the United States, or to sue in their courts; and that therefore their own municipal laws remained in force, as they did immediately

before the conquest, except so far as they had been abolished or changed by the conqueror.

But supposing the occupation of the city on the 3d of May, 1862, to have been of such a character as to displace the Confederate laws and usages, and to bring the territory under the allegiance and sovereignty of the United States, what then would be the effect upon this contract? Wherever the arms of the United States prevailed in the late conflict, they exercised towards the territory and people of the Confederate States the rights of conquest as against a foreign nation. This is the most unfavorable light in which the situation could be viewed for the Southern people. Whether it is a rightful one or not, it would be profitless to inquire. We have to deal with the facts. as they existed. It is a well settled principle of the international code, that the laws of a conquered or ceded country remain in force till altered by the new sovereign (9 Peters, 734, 748). The right of the king to legislate over a conquered country, and to alter its laws, is one which, Lord Mansfield said, was never denied in Westminster Hall, or questioned in Parliament. *Campbell* v. *Hall*, Cowper, 204. And in this. country, the right of the military commander, holding possession for the United States, to establish provisional or temporary governments, and to ordain laws to operate over conquered territory, is fully recognized by the Supreme Court of the United States, and has been acquiesced in by this court. *Leitensdorfer* v. *Webb*, 20 How. 176; *Scott* v. *Billgerry*, MS., decided at April Term, 1866. And such ordinances displace and supersede every previous institution of the vanquished or deposed political power, which is incompatible with them, and continue in force during the period of the military occupation, or until altered by the proper legislative power.

The bill alleges, that at the time of the purchase of these bills single by the complainant, the commanding general of the United States had refused to forbid the circulation of Confederate currency in New Orleans, but, on the contrary, had ordered that said money be continued in circulation, which orders were in operation at the time of said purchase. This

order was as potent to legalize the circulation and use of Confederate money while it remained in force, as an express act of Congress could have been. The subject was within the jurisdiction of the officer as an incident of the power of conquest and occupancy, and all the people were bound to obey on pains and penalties such as were never written down in any civilized code. The laws and usages in relation to the circulation of Confederate money existing in Louisiana at the time of the conquest and occupation of the city of New Orleans, were not only not altered by the conqueror, and not superseded by his general policy, but were expressly reënacted and confirmed, for a limited period at least, and published for the guidance of the people. It would appear that, in fact, General Butler, immediately on his arrival at New Orleans, knowing that this description of currency constituted the entire circulating medium of the city and country, and that its immediate suppression would cause the greatest embarrassment and distress, in his first general order, dated May 1, the very day on which the first troops were landed, declared that the continued circulation of Confederate notes was permitted until further orders. And, to give time for the people to accommodate themselves to the new order of things, he issued another order, dated May 16 (General Order No. 29), prohibiting all circulation of, or trade in, these notes, after the 27th day of the same month. We can imagine no principle of law or reason that would justify us in holding a contract entered into in New Orleans for the consideration of Confederate money at any time prior to the 27th of May, 1862, to be in violation of any law or public policy of the United States, and more especially where such contract was made subsequent to the first day of that month.

It is, however, insisted that this contract was made in Louisiana, and is to be governed by the laws of that State, and that by those laws it is an illegal and void contract, and therefore must be held to be so here.

Two divisions of the Supreme Court of that State have been referred to. The first is the case of *Schmidt* v. *Barker*, 16 La. Ann. R. 261. That was a suit against a banker, to recover a bal-

ance of money deposited between the 17th of January and the 1st day of April, 1862, under an agreement that the money so deposited was to be drawn out only in Confederate money. It does not appear what kind of funds was deposited, but as Confederate money was then almost the only circulation, it may be supposed that the deposits were made in that currency. In 1864, the defendant balanced the plaintiff's bank book, stating a balance due him of $400 in Confederate notes. The plaintiff claimed to recover United States legal tender notes, and the defendant filed and offered with his answer, the amount in Confederate money. The court viewed the condition on which the deposit was received, which contemplated the aiding of the circulation of the "treasonable issue of rebels in arms against the United States," as a nullity, which rendered void the agreement dependent upon it, and they dismissed the action. This conclusion is the opposite of that to which we came in the case of *Green* v. *Sizer*, which was very similar in its leading facts.

The other case referred to is that of *Emerson* v. *Lee*, MS. which was a suit to recover the amount of a note, of which the plaintiff had, in 1862, been compelled by duress to receive payment in Confederate money, which he alleged he had never considered or treated as a payment, but had always kept the notes without using them, and now tendered them back to defendant. The court did not, in this case, treat the use of Confederate money as illegal, or declare the payment necessarily a nullity on that ground, but they rested the right to relief primarily on the ground of the duress, and ultimately denied any redress because the plaintiff did not produce and offer back the identical notes he had received, which, they say, had some value, and might have been bartered, or made merchandise of, by the plaintiff, and afterwards replaced at small cost. This conclusion was proper, the case being put on the ground of duress, but would hardly have been reached unless on the idea that if the money had been received voluntarily, it would have been a good payment of the note.

On the authority of these two decisions, we are asked to declare the sale of the bills single in controversy to be illegal and void.

We recognize the right of the courts of Louisiana to expound their own local laws, whether written or unwritten, and whether statute, common, or civil law; and in such cases we hold ourselves bound by the State construction, when that is settled, and can be ascertained. But this case does not depend upon the local law of Louisiana; it involves only a question of the public policy of the United States, under the Federal Constitution and laws; it is the same in every State in the Union, and we think it very questionable whether it is one of the cases in which we are bound to receive the law at the hands of the courts of another State, even in regard to matters arising within its limits.

On *Marlatt* v. *Silk*, 11 Peters, 1, the controversy related to the title to land situate in Pennsylvania, and arose under a compact between that State and the State of Virginia. The Supreme Court of Pennsylvania had decided the question, and it was insisted that this decision, being in regard to the title of land in that State, was conclusive. But the court said that the principle of the conclusiveness of State decisions did not apply. " It was laid down in reference to cases arising under, and to be decided by, the laws of the State; and then the decisions of that State are looked to, to ascertain what that law is; whereas, in the case at bar, the question arises under, and is to be decided by, a compact between two States; where, therefore, the rule of decision is not to be collected from the decisions of either State, but is one, if we may so speak, of an international character."

Again, in *Martin* v. *Waddell*, 16 Peters, 367, the question was as to the construction of the .grant by Charles II. to the Duke of York, of the territory composing the State of New Jersey, and involved the title to land in that State. The Supreme Court of the State had settled the construction of the charter, and it was insisted that, as the matter in dispute was local in its character, and concerned fixed property within the limits of New Jersey, the decision of the tribunals ought to settle it, and that the courts of the United States were bound to follow it. The court said: " It may be-doubted whether this

case falls within the rule in relation to the judgments of State courts when expounding their own constitution and laws. The question here depends not upon the meaning of instruments framed by the people of New Jersey, or by their authority, but upon charters granted by the British crown."

These cases serve, in some degree, to show in what sense the rule, as to the obligatory character of State decisions, is to be understood; and it is unnecessary for us to determine whether the rule applies in cases like the present, where the question is upon a subject affecting all the States alike, and not local or peculiar to any.

It is enough to say, that if we admit the authority of the Louisiana decisions to the fullest extent, they do not cover the present case. The transactions in those cases occurred before the occupation of New Orleans by the Federal forces, and before the issuance of the order of the commanding general, authorizing the circulation and use of Confederate money. This contract having been made under the authority of that order, and while it remained in force, we presume its efficacy would not be denied by the courts of that State, to make the contract valid, whatever might be thought of the preëxisting law or policy on the subject. We feel, therefore, entirely free to determine this case upon our own views of the legal principles on which it depends.

There is another reason, in addition to the foregoing, why the Louisiana decisions cannot control this case. It is undoubtedly true, as a general rule, that an assignment of negotiable paper must be made in conformity with the law of the place where the assignment is made, and that if invalid by the law of that place, it will also be held to be invalid in another State or country, notwithstanding that it would have been a valid assignment if made at the latter place. Story's Confl. Laws, sections 316, 353; *Trimby* v. *Vignier*, 1 Bingh. New Cas. 151; 27 Eng. Com. L. R. 336.

But in this State an exception to this rule has been established, and it is here held that where the assignee of a note seeks to enforce a mortgage of real estate situated in this State,

if he has acquired a right to do so in conformity to the laws of this State, he is entitled to his remedy. "We know of no instance," say the court, "in which an assignment has been questioned, if made according to the law of the State in which the debtor resides, when the contract is payable there, and sought to be enforced there, when real estate is the subject of controversy. * * * And we apprehend that whilst a mere assignment of the bonds, made according to the laws of Louisiana, would be binding, that an assignment made according to the laws of this State, would also be valid at law. In equity it surely would be." This was said in a case where bonds were assigned in Louisiana, without the observance of the prescribed forms, in consequence of which the assignment was invalid by the laws of that State. *President and Selectmen of Natchez* v. *Minor*, 9 S. & M. 544. The facts of that case were almost identical with the present, and the authority is decisive of this case.

It is finally insisted for the appellee, that if this contract was valid at the time it was made, it cannot now be enforced. That it would be invalid if made now, and being a foreign contract, depending upon the principle of comity for its enforcement here, the court ought to refuse its aid.

We cannot yield to this reasoning. The validity of every contract depends on the law in existence at the time when it is made, and it cannot be affected by subsequent changes in law or policy. And as long as we enforce such contracts, entered into within our own limits, and between our own people, there can be no injury to our citizens; certainly no violation of our laws or our policy, and no pernicious example, by extending the same favor to similar contracts made in other States.

On the whole we are of opinion, that the bill of complaint sufficiently states a case entitling the plaintiff to relief, and that the court below erred in allowing the demurrer and dismissing the bill. The decree will therefore be reversed, and the cause remanded, and the appellee required to answer the bill within thirty days.