## ZIA, Pueblo of *v.* UNITED STATES.

### APPEAL FROM THE COURT OF PRIVATE LAND CLAIMS.

No. 5.   Argued October 12, 1897. — Decided November 15, 1897.

**An** officer of the Pueblo of Zia and an officer of the Pueblos of Santa Aña
and Jemez, in 1766, petitioned the Spanish governor and captain general,
setting forth "that they. from their foundation, have considered as their
pasture ground, in the vicinity of their said pueblos, a valley commonly
called the Holy Ghost Spring, and that in some urgent cases, the same
as is known, is used as a pasture ground for the horses of this royal
garrison, and the said parties being aware that the said valley has had,
in its vicinity, some applicants to acquire the same by grant, which will
cause them very great injury, as they have considerable cattle, sheep,
goats and horses for the royal service, and not having any other place
in which to pasture them, particularly the people of the Pueblo of Zia,
the greater part of whose fields are upland, and some of them in the
glens of said valley, adjoining their said pueblo," and asking him to "be
pleased to declare said valley to be the legitimate pasture grounds and
pastures of the pueblos, directing that the boundaries thereof be desig-
nated-to them, that is, on the east, the pueblos aforesaid, on the west,
the summits of the Puerco River, on the north, a place called the Ventana,
where some Navajo Apaches reside, and on the south, the lands of the
citizen settlers of said Puerco River." On receipt of this petition the
captain general ordered an examination to be made, and, upon the coming
in of a favorable report, ordered the alcalde to give royal possession of
the grant to the petitioners and the boundaries therein set forth. *Held,*
that the language used in the documents indicated nothing more than a
right to pasture their cattle upon the lands in question; that the grant
did not vest the title to the lands in the petitioners, but was a mere
license to use them for pasturage, which license, if- not revoked by sub-
sequent grants, was revoked by the treaty of Guadalupe Hidalgo, ceding
the entire territory to the United States; and that the title to the land
was not one "lawfully and regularly derived from the government of
Spain," nor "one that if not then complete and perfect at the date of
the acquisition of the territory by the United States the claimant had a
lawful right to make perfect, had the territory not been acquired by the
United States," as provided for in the act of March 3, 1891, c. 539, creating
the Court of Private Land Claims.

THIS was a petition by the Pueblos of Zia, Santa Aña and
Jemez for the confirmation of what is known as the Ojo del
Espiritu Santo grant, containing about 382,849 acres.

The *testimonio*, or official copy of the proceedings, opens

with the following petition to the governor and captain general, presented in 1766, by Felipe Tafoya, as the agent of these pueblos:

" His excellency the governor and captain general:

" I, Felipe Tafoya, lawyer of this town of Santa Fé, appear before your excellency in full legal form, for and in the name of Cristoval, Indian governor of the Pueblo of Zia, and Thomas, chief war captain of said pueblo, who come under appointment from their casique, and of the other inhabitants of their Republic, and, sir, in the name of the aforenamed, and of the community of the Pueblos of Santa Aña and of Jemez, do state that they, from their foundation, have considered as their pasture ground, in the vicinity of their said pueblos, a valley commonly called the Holy Ghost Spring, and that in some urgent cases, the same as is known, is used as a pasture ground for the horses of this royal garrison, and the said parties being aware that the said valley has had, in its vicinity, some applicants to acquire the same by grant, which will cause them very great injury, as they have considerable cattle, sheep, goats and horses for the royal service, and not having any other place in which to pasture them, particularly the people of the Pueblo of Zia, the greater part of whose fields are upland, and some of them in the glens of said valley, adjoining their said pueblo. In consideration of all of which, I ask and pray that your excellency, in the name of His Majesty, (whom may God preserve,) be pleased to declare said valley to be the legitimate pasture grounds and pastures of the pueblos, directing that the boundaries thereof be designated to them, that is, on the east, the pueblos aforesaid, on the west, the summits of the Puerco River, on the north, a place called the Ventana, where some Navajo Apaches reside, and on the south, the lands of the citizen settlers of said Puerco River, and, should your excellency order to be done as I have requested, the said parties, my clients, will receive grace with the justice which I ask, and declare in their name that this is not in dissimulation, and so forth.

                                   " FELIPE TAFOYA."

Upon the receipt of this petition and on June 16, 1766, Velez Cachupin, governor and captain general, made an order commissioning the chief alcalde of said pueblos, Bartolomé Fernandez, "to the end that, having examined the boundaries which they mentioned as of the Holy Ghost Spring, where they state they pasture their stock and horses, he reports to me the leagues the same may embrace from north to south and from east to west, and whether the aforesaid three pueblos have the cattle, sheep, goats and horses proportional to the boundaries asked for their grazing, and also whether or not any citizen or citizens are damaged by said boundaries under any prior valid grant and possession held by them, which the said chief alcalde will perform with all possible veracity."

Fernandez reported that he proceeded to examine the lands and their boundaries, and after establishing the quantity, found that they were "only suitable for pasturing live stock, which is abundant at said pueblos, though the said three republics have no other lands on which to sustain their stock, and it being, as it is true, that none of the aforementioned boundaries will injure any one holding or to hold possession of lands within the same, which proceedings I placed on record," etc.

Upon this report the captain general made the following decree :

"In the town of Santa Fé, on the sixth day of the month of August, one thousand seven hundred and sixty-six, I, Thomas Velez Cachupin, governor general of this kingdom of New Mexico, in view of what is petitioned for by the three Pueblos of Santa Aña, Zia and Jemez, of the Queres nation, and of the report which their chief alcalde, Bartolomé Fernandez, makes, that they have held said lands for their live stock, which at present is abundant, without having any other places in which to pasture them, except those referred to in their petition, together with the small watering places mentioned in said report, declare that I would grant, and I did grant, in the name of His Majesty (God preserve him), the

aforesaid lands for pasturing the stock and horses of the aforesaid three Pueblos of Santa Aña, Zia and Jemez, with the boundaries, from north to south, from the place Ventana to the stone ford of the Puerco River, the boundaries also of the citizens of the place San Fernando of Nuestra Señora de la Luz; and from east to west, from the Pueblo of Zia to the said Puerco River, the eastern edge, the whole of the valley of the Holy Ghost Spring being embraced within the centre and within the boundaries of this grant, with the condition and stipulation: that in case of necessity the horses of this royal garrison of Santa Fé may, and shall be, kept in said valley, the same being a place where they have been accustomed to graze; wherefore the aforementioned three pueblos are to place no obstacle in the way, nor claim damage therefor; and the aforementioned boundaries being for the future considered those of the aforementioned three pueblos, they will hold the same with legitimate title under this royal grant, so that they be not molested by any Spanish citizen or citizens, taking their stock thereupon, deeming the pasturage to be common. And I direct the chief alcalde, Bartolomé Fernandez, to go and give to the aforementioned three pueblos royal possession of this grant, and the boundaries therein set forth, taking with him the justices and seniors of each one of them, and placing his proceedings on record, following this my granting decree, which he will return to me, in order to furnish to each pueblo the proper testimonio of the whole, and deposit the original in the archives of this government, where it shall remain.

"And I so provided, granted, ordered and signed, acting with two attending witnesses in the absence of notaries, there being none of any kind in this jurisdiction.

"THOMAS VELEZ CACHUPIN.

"Witness: CARLOS FERNANDEZ.
"Witness: DOMINGO SABADIA."

In compliance with this decree of the governor and captain general, Bartolomé Fernandez, the alcalde, made report to the governor that he proceeded to the aforementioned pueblos,

and, in company with the governors, casiques and other authorities, proceeded to the lands asked for by the natives of the said three republics, and summoning the contiguous land holders, took by the hand the aforesaid governors and the magistrates, " and conducted them over said land ; and they shouted ' Long life to the King, our sovereign, whom may God preserve,' and they cast stones, and pulled up grass, in sign of possession, which I gave them, and which they received quietly and peaceably, without any opposition whatever, under the conditions mentioned in the aforesaid grant," etc.

The claim was presented to the surveyor general under the law of July 22, 1854, and through the Secretary of the Interior reported to Congress for confirmation, but no action was ever taken. The petitioners also produced evidence tending to show that since the date of the grant they have been continuously and openly in possession of the property, pasturing their cattle upon it and cultivating certain portions, under a claim of exclusive right thereto by virtue of the grant ; that they are now in the open and notorious occupation of the same as the owners in fee, except a portion of it which may be in conflict with a certain grant called the Santissima Trinidad Galvana Ignacio Sanchez Veraga tract, in regard to which they admit they have released the same unto the claimants thereof. The continuity and exclusiveness of this possession were denied by the witnesses produced by the Government.

In defence it was shown by the Government that three subsequent grants were made, one in 1815 to Luis Maria Cabeza de Baca, known also as the Ojo del Espiritu Santo grant ; another in 1786, known as the San Isidro grant, and another made 1798, known as the Cañon de San Diego grant, in connection with which parol evidence was admitted to show a conflict between these grants and that of the petitioners to a large, if not to the entire, extent of their grant.

Upon this state of facts the Court of Private Land Claims made a decree rejecting the grant, and dismissing the petition of petitioners upon the ground that the grant was not in fee, but a license to pasture. From this decree the petitioners appealed to this court.

*Mr. Henry M. Earle* for appellants.

*Mr. Matthew G. Reynolds* for appellees. *Mr. Solicitor General* was on his brief.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

The main question in this case is whether the language of the documents, which make up the *testimonio*, indicates anything more than the grant of a right to these pueblos to pasture their cattle upon the lands in question — a right somewhat akin to the right of common under the English law, and one which appears to have been frequently granted under the Spanish law. *United States* v. *Huertas*, 8 Pet. 475; *United States* v. *Davenport's Heirs*, 15 How. 1.

The words of the several documents set forth in the *testimonio* certainly favor this interpretation: Thus, in the petition, there is no application for a grant of vacant land for cultivation and pasturage, as is usual in this class of cases, but a statement that the pueblos "have considered as their pasture ground in the vicinity of their pueblos, a valley commonly called the Holy Ghost Spring," (which, it seems, had been used in some cases as the pasture ground for the horses of the royal garrison,) and that some applicants were desirous of acquiring the same by public grant, "which will cause them very great injury, as they have considerable cattle, sheep, goats and horses for the royal service," and have no other place in which to pasture them. There was no claim of a grant of the lands, such as the other applicants were seeking to acquire, but a request to have them *considered as their pasture ground*, and as the pasture ground for the horses of the royal garrison. The prayer bears out this construction of the statement of the petition. It asks, not for a grant of the land, but that his excellency will "be pleased to declare said valley to be the legitimate pasture grounds and pastures of the pueblos," directing a designation of their boundaries, etc.

The order of the captain general upon this petition and the report of the chief alcalde are addressed only to the ascertainment of the boundaries, and to the fact whether there was any other prior grantee in possession, and throw but little light upon the granting act.

The final grant or decree, however, states that the captain general granted the aforesaid lands "for pasturing the stock and horses of the aforesaid three pueblos," designating the boundaries, and with the stipulation that in case of necessity the horses of the royal garrison of Santa Fé might be kept in the valley where they had been accustomed to graze, and decreed that the aforementioned three pueblos "will hold the same, with legitimate title, under this royal grant, so that they be not molested by any Spanish citizen or citizens, taking their stock thereupon, deeming the pasturage to be common." The alcalde was further directed to give royal possession of the grant which he certifies in the act of possession that he did by taking by the hand the governors and war captains of the pueblos with their magistrates, and conducting them over the land, and making a livery of seizin by shouting "Long life to the King, our sovereign, (whom may God preserve,)" and casting stones and pulling up grass in sign of possession, "which I gave them and which they received quietly and peaceably without any opposition whatever, under the conditions mentioned in the aforesaid grant," and, subsequently, attesting these formalities with witnesses.

There is nothing in any of these instruments to indicate that the pueblos desired, or that the governor intended to grant anything beyond a common, whereon the inhabitants of the pueblos might pasture their stock in conformity with ancient usage. When it is considered that the valley was already used as a pasture ground for the horses of the royal garrison, it is to be inferred that the rights of these pueblos were practically the same as those of the royal garrison, and were not intended to involve a conveyance of a fee of the land. It is true that by the common law of England, livery of seizin was only necessary to be made upon the granting of an estate of freehold, either of inheritance or for life, (2 Bl.

Com. 314;) but, under Spanish law, it seems to have been a feature commonly connected with the delivery of possession of the land, though to what extent is somewhat uncertain.

The granting clause is not in the usual form of a grant of vacant lands to the grantee for cultivation and pasturage upon condition of actual possession for a number of years. Nor are there any words indicating an intention to pass a fee simple, such as found in some of the Spanish grants, *para adquirir légitimo derecho de propiedad y señorio,* " in order to acquire legitimate right of property and dominion." These words, *propiedad y señorio,* carry the idea of complete ownership, and seem to be practically the same as the words " fee simple " under the common law.

Upon the contrary, the grant in question provides that the grantees " shall hold the same with legitimate right " of possession (*para que lo posean con derecho légitimo*) " under this royal grant, so that they be not molested by any Spanish citizen taking their stock thereon, deeming the pasture to be common." It would seem to have been the intention of the governor by these words to vest the pueblos simply with the right to the use of the lands without intending to estop himself, or his successors, from making a subsequent disposition of the same by a grant in fee. This construction is also borne out by the fact that within a few years thereafter a grant was made of the entire tract to other parties. As remarked in the opinion of the court below, " it seems quite unreasonable to suppose that, if this area in controversy had been granted as an estate in fee to the land, the same granting authority would have deliberately granted a portion of the same land to a third party only twelve years after the former grant, repeat a like act in 1815 and afterwards, and that, too, of land situate near the capital, grazed upon by the royal horses of the capital garrison, and the local alcalde directed in every case to report officially whether the land proposed to be granted was unoccupied, or that the grant would be to the injury of third parties. This grant was prayed solely as a pasturage right; it seems to have been granted for that purpose alone, and it appears that the governor afterwards treated it as such, and disposed

of the paramount title to a large part of the land upon the same view."

In the absence of direct testimony it is somewhat difficult to ascertain with precision the laws of Spain with respect to grants of pueblo lands; but in 2 White's New Recopilacion, 254, it is stated by Nicholas Garrido, apparently acting for the Duke of Alagon, in a communication addressed to the governor of Florida, that "the concession of a great extent of land for the rearing and pasture of cattle, constitutes no more than the usufruct of it, for the time agreed upon, but the grantee has not, nor never had, the most remote right to solicit the proprietorship, for there is no law or regulation upon which to found it, and consequently the land does not go out of the class of public lands, since it is the same as if it were held on rent. Those who have obtained those concessions as recompense for services are in the same class with the others, and can allege no other right, than what is extended to all those who have suffered losses, and faithfully followed the cause of his majesty." From the correspondence, of which this opinion was a part, and which was considered by this court in *United States* v. *Clarke*, 8 Pet. 436, 459, it would seem that there was a recognition by the governor and civil authorities of Florida of a distinction between absolute grants of land and "allotments of land made for raising cattle, which may not have titles of proprietorship," (2 White, 252,) the latter of which did not vest in the grantee the ownership of the lands. Certainly if a grant in these terms were made in a State in which the common law prevails, it would be treated simply as a license to pasture, terminable at the will of either party. Such information as we are able to obtain regarding the law of Spain favors a like interpretation of this grant.

The evidence of possession in this case was perfectly consistent with the grant, which on its face vested the pueblos with such possession, and besides, the testimony was of such a vague and contradictory character as to throw but little light upon the nature of the occupation.

The case of *United States* v. *Huertas*, 8 Pet. 475, relied upon

by the petitioners, seems rather to bear against them. It is said by Chief Justice Marshall, in his brief opinion, that the governor in his decree making the concession states his own knowledge of the facts set forth in the petition, namely, the many and great services rendered to the government in an insurrection. He grants the ten thousand acres with the precise condition to use the same for the purpose of raising cattle, "without having the faculty of alienating the said tract without the knowledge of this government"; but, he adds, that on the 20th of July, 1816, three years after the concession, Governor Coppinger granted a complete title to this land, reciting the decree made by Governor Kindelan, and the boundaries of the land. It was this second grant which evidently fixed the title of the grantee, notwithstanding the limitations of the prior grant.

Upon the whole, we are of opinion that the court below was correct in holding that the grant in question did not vest the title to the land in the petitioners, but was a mere license to use them for pasturage, and that such license, if not revoked by the subsequent grants, was revoked by the treaty of Guadalupe Hidalgo, ceding this entire territory to the United States; *Wallis* v. *Harrison,* 4 M. & W. 538; *Cook* v. *Sterns,* 11 Mass. 533; *Harris* v. *Gillingham,* 6 N. H. 9; *Cowles* v. *Kidder,* 24 N. H. 364, 379; *Blaisdell* v. *Portsmouth, Great Falls &c. Railroad,* 51 N. H. 483; *Coleman* v. *Foster,* 1 Hurl. & Norm. 37; *S. C.* 37 E. L. & E. 489; *Prince* v. *Case,* 10 Connecticut, 375; and that in the language of § 13 of the act of March 3, 1891, c. 539, 26 Stat. 854, creating the Court of Private Land Claims, the title to the land in question was not one "lawfully and regularly derived from the government of Spain," or "one that if not then complete and perfect at the date of the acquisition of the territory by the United States, the claimant had a lawful right to make perfect, had the territory not been acquired by the United States."

The decree of the court below is therefore

*Affirmed.*