[No. 1288.    January 2, 1912.]

GEORGE W. STONEROAD et al, Appellees, v. WILLIAM P. BECK et als, Appellants.

SYLLABUS.

1. To establish its claim of title to an undivided interest of the overlap of two grants, the intervenor introduced the Act of Confirmation by Congress and the patent issued thereunder. To avoid the apparent effect of this proof the appellees must accept the burden of establishing a perfect legal title or right independent of their title by the Act of Confirmation.

2. Upon the cession of New Mexico to the United States all the laws of Mexico relating to subjects non-political in their character remained in force, but were administered by officers appointed and controlled by the United

Stoneroad v. Beck, 16 N. M. 754.

States. Likewise, in Mexico, after the independence of that country by the plan of Iguala and the other acts referred to, the laws of Spain in force at that time of a nonpolitical character were continued and remained in force and the officers of Spain having in charge the enforcement of those laws were made the officers of the Mexican nation.

3. The Preston Beck and Perea grants being both void grants owe their validity entirely to the Act of Congress confirming them.

4. The right to a patent once vested is treated by the government, when dealing with public lands, as equivalent to a patent issued. When in fact, the patent does issue, it relates back to the inception of the right of the patentee, so far as it may be necessary to cut off intervening rights.

5. The above rule can have no application to the case at bar, because it cannot be said, either upon the application to the Surveyor General or upon his favorable report upon the application, did a right to patent vest.

6. The claimants of the Preston Beck grant had no equitable right or title previous to the Act of Confirmation. The Act of Confirmation should not, as to the Preston Beck grant, be given effect by relation as of an earlier date, so as to take priority over the Perea grant. Both are equal in time. The intervener and appellee holding by the same Act of Congress so far as their grants conflict or overlap, have each an equal undivided moiety of the lands within the conflict.

7. The giving of juridical possession in 1825 to the Beck grant did not constitute a circumstance granting a feature of superiority, although no juridical possession was conferred to the Perea grant.

8. Even though when the treaty was signed, there was a license to occupy in favor of the Beck grantees, this license or permissive possession was revoked ipso facto by the treaty and when the treaty was signed these propperties passed to the United States as public domain to be dealt with by Congress.

9. The mere circumstance that one claimant reached the Surveyor General's office first in order to present his claim cannot be considered as affecting the rights of other parties.

10. The fact that a contract for survey had been first let for the Beck grant could not operate to render nugatory an Act of Congress which confirmed equally to the Perea grant and to the Beck grant the interest of the government in the lands involved.

Appeal from the District Court for San Miguel County, before WILLIAM J. MILLS, Chief Justice. Reversed and judgment entered.

STEPHEN B. DAVIS, JR., and CHARLES A. SPIESS for Appellants and Intervenors.

The title to public lands was vested in the Mexican nation. Republic v. Thorn, 3 Tex. 499; Good v. McQueen's Heirs, 3 Tex. 241; U. S. v. Coe, 171 U. S. 681; U. S. v. Hartwell's Heirs, 22 How. 288; Leese v. Clark, 3 Cal. 16; Pino v. Hatch, 1 N. M. 125; Pollard's Lessee v. Hagan et al, 3 How. 225; Jones v. Borden, 5 Tex. 410.

When title passes to the new sovereignty it alone has authority to determine how its property shall be disposed of. Ely's Administrator v. U. S., 171 U. S.; Pino v. Hatch, 1 N. M. 125; Jones v. U. S., 137 U. S. 202; in re Cooper, 143 U. S. 503; Cessna v. U. S., 169 U. S. 165.

The colonization law of 1823 was valid. Cessna v. U. S., 169 U. S. 165; Goode v. Queen's Heirs, 3 Tex. 168; Yates v. Iams, 10 Tex. 168; Holliman v. Prebles, 1 Tex. 673; Yates v. Houston, 3 Tex. 433; 1 White's Recopolicion 594; Raynolds on Spanish and Mexican Laws; Hall' Mexican Law.

The titles to the Beck and Perea grants are American titles, not Mexican titles, and the doctrine of relation does not apply to such titles. Dent v. Emmeger, 14 Wall. 308; Menard Heirs v. Massey, 8 How 307; Chauteau v.

Stoneroad v. Beck, 16 N. M. 754.

Eckhart, 2 How. 345; Les Bois v. Bramell, 4 How. 449; Rodriguez v. U. S., 1 Wall. 482; Hale v. Ackers, 69 Cal. 160; Jackson v. Baird, 4 Johns. 230; 3 Washburn on Real Property 328; Butler & Baker's Case, 2 Coke's Rep. 29; Gibson v. Choteau, 13 Wall. 101; Lynch v. Bernal, 9 Wall. 315; Evans v. Durango Land and Coal Co., 80 Fed. 433; Henshaw et al v. Bissell, 18 Wall. 225; Beard v. Federy, 3 Wall. 479; Berthold et al v. Macdonald et al, 24 Mo. 126; 22 Howard 334; Landes v. Brant, 10 Howard 370; Doe v. Eslava, 9 Howard 421; Barry v. Gamble, 2 Howard 32; Lanfear v. Hunley, 4 Wall. 204; McCabe v. Worthington, 16 Howard 86; Trenier v. Stewart, 101 U. S. 797; St. Paul & S. City R. Co. v. Winona & St. Paul R. Co., 112 U. S. 720; Chicago M. & St. P. R Co. v. United States, 159 U. S. 372; Southern Pacific Ry. Co. v. United States, 183 U. S. 519; Sioux City & St. Paul R. Co. v. U. S., 159 U. S. 349.

JONES & ROGERS for Appellees.

Patent adds nothing to the validity of the title. Shaw v. Kellogg, 170 U. S. 341; Rutherford v. Green's Heirs, 15 U. S. 2 Wheat. 296; Bryan v. Forsythe, 60 U. S. 19 How. 234; Lagden v. Haynes, 88 U. S. 21 Wallace 521; Beard v. Federy, 3 Wall. 493; Russell v. Maxwell Land Grant Co., 158 U. S. 258.

He who secured the first confirmation or patent obtains the title. Chauteau v. Eckhart, 2 How. 345; Les Bois v. Bramwell, 4 How. 449; Willot v. Sanford, 19 How. 79; Menard Heirs v. Massey, 8 How. 307; Dent v. Emmenger, 14 Wall. 308; McCabe v. Worthington, 16 How. 87; Trenier v. Stewart, 101 U. S. 808.

The title is established from the date of the grant by the Mexican government. Colorado Co. v. Commissioners, Beard v. Federy, 3 Wall. 491; Gibson v. Chauteau, 13 Wall. 93; Catron v. Laughlin, 11 N. M. 632; Doe v. Eslavo et al, 9 How. 446; Berthold et al v. McDonald et al, 122 How. 340; Henshaw v. Bissell, 18 Wall. 266; Rodriguez v. U. S., 1 Wall. 582; Trenier v. Stewart, 101 U. S. 810; Miller v. Dale, 92 U. S. 474.

The claimants of the Perea grant had no title, legal or equitable, under the Mexican government. Haynes v. U. S., 170 U. S. 637; Malarin v. U. S., 1 Wall. 289; U. S. v. Pico, 5 Wall. 539; Moore v. Steinbach, 127 U. S. 80; Ainsa v. U. S., 160 U. S. 234; U. S. v. Pena, 175 U. S. 504.

Claimants of the Beck grant had a perfect legal title under the Mexican government. United States v. Arredondo et al, 6 Peters 713; U. S. v. Clarke, 8 Peters 456; Crespin v. U. S., 168 U. S. 213; Leese v. Clarke, 3 Cal. 16; Pino v. Hatch, 1 N. M. 125; Moore v. Steinbach, 127 U. S. 70; 12 Bancroft 726, et seq.; Ely v. U. S., 171 U. S. 221; U. S. v. Vallejo, 1 Black. 541; Moore v. Steinbach. 127 U. S. 80; 1 White 561, et seq.; 1 Galvan's Decrees 4-7; U. S. v. Green, 185 U. S. 257; U. S. v. Peralta, 19 How. 348; Catron v. Laughlin, 11 N. M. 606; Shaw v. Kellogg, 170 U. S. 339; Reynolds Spanish and Mexican Land Laws 100, et. seq.; Sutherland on Stat. Cons., sec. 168.

If the title to the Beck grant was not perfect under the laws of Mexico, yet, it was a better title than the title to the Perea grant. Pino v. Hatch, 1 N. M. 125; Pollard's Lessee v. Files, 2 How. 603; Miller et al v. Dale et al, 92 U. S. 473; Stoneroad v. Stoneroad, 158 U. S. 241; Bryan v. Forsythe, 19 How. 336; Shaw v. Kellogg, 170 U. S. 341; Langeau v. Haynes, 21 Wall. 531; Rutherfords v. Green's Heirs, 2 Wheat. 206.

The confirmation of the Beck grant was legally prior to the confirmation of the Perea grant. Landes v. Brant, 10 How. 372; Crowley v. Wallace, 12 Mo. 145; 5 Cruise on Real Property 510; Beard v. Federy, 3 Wall. 491; Henshaw v. Bissell, 18 Wall. 265; Grisor v. McDowell, 6 Wall. 379; Stark v. Starrs, 6 Wall. 418; Shipley et al v. Cowan et al, 91 U. S. 337; Gibson v. Choteau, 13 Wall. 101.

### OPINION OF THE COURT.

MECHEM, J.—This is a suit originally commenced by certain claimants of interest in the Preston Beck Grant for the purpose of determining the title of the various per-

sons claiming interest therein, and obtaining partition
of it. In the year 1903, A. A. Jones, was appointed
receiver of the grant and immediately entered into posses-
sion of a large portion of it. The Preston Beck grant, in
the southeasterly portion, conflicts with the Perea grant
to the extent of several thousand acres. The receiver ap-
pointed in this suit took possession of the Preston Beck
grant, including that portion of it in conflict with the
Perea grant. Thereafter the St. Louis Land & Cattle
Company, intervenor and appellant herein, claiming the
ownership of this land as the holder of the title to the
Perea grant, applied to the District Court of San Miguel
county, by which the receiver had been appointed, for an
order directing the receiver to surrender possession to
it of the land in conflict. The district court considered
this petition for the order directing the receiver to surren-
der possession sufficient to give jurisdiction to decide
whether the land in conflict belonged to the owners of
the Preston Beck grant or to the St. Louis Land & Cattle
Company, as the owner of the Perea grant; took evidence
as to the respective titles and finally decreed that the land
in conflict belonged rightfully to the Beck grant and the
receiver was entitled to the possession of it and the St.
Louis Land & Cattle Company had no right, title or in-
terest in or to any portion of it. From this decree the St.
Louis Land & Cattle Company had appealed to this
court. The question we are called upon to decide is as to
the title of this tract of land in conflict between the two
grants. The Preston Beck grant and the Perea grant were
both confirmed by the Act of Congress of June 21, 1860,
12 Stat. at Large, p. 71. The court below found that
both the Preston Beck and Perea grants were not only
imperfect, but were void grants prior to the action taken
by Congress with reference to them, but it held that as
the Beck grant was first made, or attempted to be made,
by certain officials of Mexico, the government of the
United States in issuing a patent for the same, in effect
declared that it was valid under the laws of Mexico, and,
being an older grant, consequently had priority over the
Perea grant. And further, that the claimants of the Beck

grant had taken the first steps necessary to acquire title by applying to the surveyor general and securing his favorable report of the grant before the claimants of the Perea grant had done so and that the patent or Act of Congress related back to the date of the acts of the surveyor general. The situation of the parties may be thus stated. By virtue of the Act of Congress confirming their respective claims, each has a patent of equal standing as far as time is concerned and as their position as grantees of the government of the United States is concerned; both, then, have a conveyance to the same tract of land. By Section 4 of the act of confirmation it is provided, "and it is further enacted that the foregoing confirmation shall only be considered as quit claims or relinquishments on the part of the United States, and shall not affect the adverse rights of any other person or persons whatsoever." If either party has the better title to the land in controversy that title must be founded on one which existed at the time of the act of confirmation. The intervenor, as the owner of the Perea grant, claims an interest in the tract in controversy, by the virtue of the act of confirmation above referred to. The appellees as owners of the Preston Beck grant resist, because, as they say, those from whom they deraign their title at the time of the Act of Congress had rights adverse to the government in the tract in dispute, which were not affected by the act of confirmation. In fact, they depend, not upon their rights as grantees of the United States, but upon an antecedent title. It is sufficient to establish its claim of title to an undivided interest, at least of the overlap that the intervenor introduces, the act of confirmation and patent issued thereunder. To avoid the apparent effect of this proof the appellees must accept the burden of establishing a perfect legal title or right independent of their title by the act of confirmation. Both parties here claim under patents of the same date. Our inquiry, in order to settle their respective rights to the land claimed by each, must extend to the character of the original grants from the Mexican government. Henshaw v. Bissell, 18 Wall. 266. It is not claimed by the intervenor that the Perea grant

was a valid grant. It was claimed by the appellee that the Preston Beck grant was a perfect grant prior to its confirmation by Congress.

The Preston Beck grant was made December 23, 1823, by Bartolome Baca, the then political chief of New Mexico. The independence of Mexico dated from February 24, 1821. On that date the Kingdom of Spain lost its jurisdiction over what is now Mexico and the sovereignty of the Mexican nation commenced. Thereafter the colonization law of the Emperor Iturbide was adopted, January 4, 1823; was in force only a short time having been suspended by the decree of April 11, 1823, and superceded by the law of August, 1824. From this it will be seen that the Preston Beck grant, made on December 27, 1823, was made during the suspension of the Iturbide colonization law of January 4, 1823. The question presented is whether or not the political chief of the Province of New Mexico had authority to make the Preston Beck grant. Counsel for appellees contend that both by express action of the Mexican government and legal presumption, it must be decided that the Beck grant was a perfect grant and made by legal authority. Both here and in the court below, as stated in the opinion of the learned trial judge, no question was raised that the grant as made would not have been valid if made by the same officer acting under the Spanish government. It is assumed by both parties to this action, as we shall assume, that under the government of Spain the political chief would have had the power to make grants of public lands. It is contended by appellees that the Mexican government by certain acts hereafter discussed continued in office the officers of Spain and continued them in the exercise of all the power and authority they may have had under the Spanish government. The acts referred to are certain portions of the plan of Iguala, the treaty of Cordova and an order of the provisional council, dated October 5, 1821. In the case of Ely's Administrator v. United States, 171 U. S. 220-228, these various acts as far as pertinent here are thus stated: "On February 24, 1821, a declaration of independence was made known on the form known as the plan of Iguala,

and this declaration of independence was made good by the surrender of the City of Mexico on September 27, 1821. The fifteenth section of this plan provided that, 'the junta will take care that all the revenues of departments of the state remain without alteration whatever, and all the employees, political, ecclesiastical, civil and military, will remain in the same state in which they exist today.' On August 24, 1821, what is known as the Treaty of Cordova was signed at that village by General Iturbide for Mexico, and Viceroy O'Donoju for Spain, the latter, however, having no previous authority from Spain, and this treaty was by Spain afterwards repudiated. This treaty provided that 'the provisional junta was to govern for the time being in conformity with existing laws in everything not opposed to the plan of Iguala, and until the Cortes shall form the constitution of the state.' Immediately after the surrender of the City of Mexico a provisional council or junta, consisting of thirty-six members, was created under the plan of Iguala, which assumed the control of the government, and on October 5, 1821, this provisional council promulgated the following order (Reynolds, p. 95): 'The sovereign provisional council of government of the Empire of Mexico, considering that from the moment it solemnly declared its independence from Spain, all authority for the exercise of the administration of justice and other public functions should emanate from said empire, has seen fit to habilitate and confirm all authorities as they now are, in conformity with the plan of Iguala and the treaty of the Village of Cordova, for the purpose of legalizing the exercise of their respective functions."

Conceding that by these acts the political chief of the Province of New Mexico was continued in the exercise of his public functions, can it be said that they continued such officer in the exercise of the power he derived from the King of Spain to alienate the public domain? These acts above referred to were necessary to secure a continuation of orderly government and prevent a condition of anarchy, and if there is nothing in them to declare a broader purpose they should not be construed to effectuate a purpose beyond that which satisfies their language. It

would not be contended for a moment that the new sovereignty intended to continue in force any law which did not recognize it, any law at variance with its paramount power and authority. On the other hand, it is equally clear that it was its intention that all the laws in force in Mexico at the date of the extinguishment of the sovereignty of Spain, should remain in force, except so far as they affected the political institutions of the New Mexican government. This same result is affected by the "doctrine that the laws of conquered or ceded country, except so far as they may affect the political institutions of the new sovereign, remain in force after the conquest or cession until changed by him." Moore v. Steinbach, 127 U. S. 70-81.

It is not to be questioned that in an inquiry in which it was important to determine what was the law of descent and distribution, for instance, in Mexico immediately after its independence and there being no new law promulgated by Mexican authority, in that event the law in force in Mexico previous to its independence would control.

The change of sovereignty affected by the overthrow of Spain and the establishment of the Mexican nation was much the same as the change of sovereignty affected by the cession of New Mexico to the Unitel States. In the case of Leitensdorfer et al v. Webb, 20 How. 176, the Supreme Court, commenting on the results of such change, said: "By this substitution of a new supremacy, although the former political relations of the inhabitants were dissolved, their private relations, their rights vested under the government of their former allegiance, or those arising from contract or usage, remained in full force and unchanged, except so far as they were in their nature and character found to be in conflict with the constitution and laws of the United States, or with any regulations which the conquering or occupying power should ordain. Amongst the consequences which would be ordinarily incident to the change of sovereignty, would be the appointment and control of the agents by whom, and the modes in which, the government of the occupant should be ad-

ministered—this result being indispensible, in order to se-
cure those objects for which such a government is usually
established. This is the principle of the law of nations,
as expounded by the highest authorities."

The plan of Iguala and the other acts of the Mexican
nation referred to were intended to accomplish two things,
first, recognize and affirm the principle of the law of na-
tions that the municipal and commercial laws of that coun-
try in force under Spanish rule should remain in force to
the extent that they were compatible with the existence
of the new sovereignty; and second, as a consequence in-
cident to a change of sovereignty to appoint and control
every public officer, so that "all authority for the exercise
of the administration of justice and other public functions
should emanate" from the new sovereign. Upon the ces-
sion of New Mexico to the United States all the laws of
Mexico relating to subjects non-political in their charac-
ter remained in force but they were administered by of-
ficers appointed and controlled by the United States.
Likewise, in Mexico, after the independence of that coun-
try by the plan of Iguala and the other acts referred to,
the laws of Spain in force at that time of a non-po-
litical character were continued and remained in
force and the officers of Spain having in charge the
enforcement of those laws were made the officers of the
Mexican nation. It cannot be supposed that the states-
men of Mexico were ignorant of the principles of the law
of nations, a subject of great antiquity and of world-wide
application. It is to be presumed, on the contrary, that
in erecting a new nation by which the previous political
relations of the people of that country were dissolved,
they would regard as eminently necessary that the rela-
tions of the people to each other and their rights of prop-
erty should remain undisturbed, and further, that until
a more perfect government should be ordained, the gov-
ernmental machinery than in existence should be con-
tinued in action for the time being. It is indicative of
this purpose that the junta or council is termed "provis-
ional," that the treaty of Cordova provided that, "the
provisional junta was to govern for the time being in

conformity with existing laws in everything not opposed
to the plan of Iguala, and until the Cortez shall form a.
constitution of the state."

The act of habilitation, above referred to, was adop-
ted by the provisional council on October 5, 1821, in con-
formity with the treaty of Cordova and the plan of Iguala.
The provisional council or junta remained in power until
the assembling, on February 24, 1822, of the Congress,
elected under the provisions of the plan of Iguala and the
treaty of Cordova, for the purpose of framing a constitu-
tion. (Raynolds, p. 31). From the foregoing, it is very
evident that the government of Mexico during this period
was temporary and provisional in character. That it,
while holding in its hands the supreme power, perhaps,
yet it was only clothed with that power by necessity until,
as was contemplated and as was afterwards done, a constitu-
tion might be adopted. In such a case it would seem that
the temporary government had power only to preserve or-
der, to maintain a condition of political non-action until
the new sovereignty should be manifested through the, at
that time well recognized, forms of constitutional govern-
ment. It would seem, therefore, that a proper construc-
tion of the various acts relied upon by appellees must be
construed in the light of these conditions and should not
be given a construction to include matters and things cer-
tainly not within their exact letter nor within their spirit.

It is significant that of the ten grants made in New
Mexico between the date of Mexican independence and the
law of August 18, 1824, of which we have any records,
four including the Preston Beck grant were confirmed by
Act of Congress and the remainder were rejected by the
Court of Private Land Claims.

"The grants confirmed by Congress are: Ojito del
Rio Gallinas; date of grant, December 23, 1823; confirmed
by Congress, June 21, 1860. Casa Colorado; date of
grant, September 15, 1823; confirmed by Congress, De-
cember 22, 1858. Brazito grant; date of grant, 1822 or
1823; confirmed by Congress June 21, 1860. Anton Chico
grant; date of grant, February 13, 1822; confirmed by
Congress June 21, 1860. As shown by the docket of the

Court of Private Land Claims, the following claims were presented to the court for confirmation and rejected. The decrees of the court are not accessible: No. 59. Juan Gid or John Heath grant (Dona Ana county, 108,000 acres); date of grant, December 27, 1822; decree rejecting claim filed June 26, 1895, Court of Private Land Claims. No. 142, No. 204, No. 206. Vallecito de Lobato grant; dated February 23, 1824. Rio Arriba county, 114,400 acres. Claim rejected and petition dismissed October 5, 1897, by Court of Private Land Claims. February 4, 1898, appealed and allowed. No. 174: Jose Ignacio Martinez grant. Taos county, 500 acres. Grant dated October 30, 1821. Dismissed and grant rejected January 31, 1898, by Court of Private Land Claims. No. 175. Felipe Medina grant. Taos county, 300 acres. Dated July 24, 1823. Petition dismissed and grant rejected January 31, 1898, by Court of Private Land Claims No. 176. Manuel Fernandez grant, Taos county. Dated December 20, 1823. Petition dismissed and grant rejected January 31, 1898, by Court of Private Land Claims. No. 241. Paraje del Rancho grant. Taos county, 90,000 acres. Dated December 27, 1821. Petition dismissed May 17, 1897, by Court of Private Land Claims.

In the case of Leese v. Clark, 3 Cal. 16-23, the court said: "Prior to the Mexican Revolution which produced the plan of Iguala, February 24 1821, the unappropriated lands in this country constituted a part of the domain of the Spanish monarchs, who alone represented and exercised the sovereignty of the Spanish nation. The royal governors were the mere deputies of the King, and exercised the sovereignty in his name. His will, manifested in the form prescribed by his regulations, operated as a valid alienation of the public domain. His governors, acting under his authority, and in his name, were the mere executors of his will—whence the law or decrees of the kings, and the regulations and usages of their governors, sanctioned by royal approval or acquiescence, afforded the proper tests by which to determine the validity of grants of land belonging to the nation whose sovereignty those kings represented and exercised, and they are accordingly

consulted and relied upon by the courts of the United States in adjudicating Spanish claims in Florida and Louisiana. But, on the 24th of February, 1821, the relation between Mexico and Spain ceased; and the sovereignty became vested in the Mexican nation; and since that time no valid alienation could be made in any of the territories of Mexico, except by an act of Mexican sovereignty. The royal decrees, regulations and usages, ceased to have any effect whatever as to subsequent grants of land. This point was determined by the Mexican Congress, in a case which arose shortly after the independence of that government, and has ever since been acquiesced in. On the 17th of January, 1821, the elder Austin obtained an inchoate grant of lands from the royal governor of Texas. On the 19th of August, the Mexican governor of that province (Martinez), assuming the powers properly exercised by the royal governors, modified the grant in favor of the younger Austin. Had the royal laws and usages still continued to retain their force, the acts of Martinez would have been valid, but the Mexican government, at the same time it recognized the act of the royal governor as valid, because done before the change of sovereignty, refused to confirm the act of its own governor, done after the change, on the ground that the sovereignty could be exercised only by the Mexican nation. The subject attracted public attention, and the Mexican government were about passing a general law in relation to the alienation of public lands, when Iturbide forcibly dispersed the members of that body, and caused himself to be proclaimed emperor. On the 4th of January, 1823, he promulgated a general law on the subject, but, being shortly afterwards deposed, Congress, on the 11th of April, 1823, suspended that law. On the 18th of August, 1824, Congress enacted a general colonization law, prescribing the mode of granting public lands throughout the Mexican territory. (White's Recop. 561, 8, 71, 76 and 82).

Stephen F. Austin, alluded to in the case just cited as the "younger Austin," on November 1, 1829, addressed to the "settlers in what is called 'Austin's colony'" in Texas, on account of his negotiation with the Mexican

government, in which he says that at the time of his arrival in the City of Mexico on the 29th day of April 1822, "the national Congress had been in session since the 24th of February of that year. The form of government as then established was a limited monarchy, in conformity with the plan of Iguala and treaty of Cordova, and the Spanish constitution was provisionally adopted. The executive department was administered by a regency, of which the generalissimo, Don Agustin Iturbide, was president." After describing the unsettled conditions then existing, he continues, "on examination into the state of this colonization business, he (Austin) found that the regency had decided that the Governor of Texas, Martinez, was not sufficiently authorized to stipulate what quantity of land the new settlers were to get, as he did by his letter to Austin, of the 19th of August, 1821, and that this point must be settled by a law of Congress, for which purpose all documents relative to said new settlement were transmitted by the regency to Congress."

There seems to have been no doubt of the validity of the grant to Moses Austin, a Spanish subject, made under the Spanish government, but the regency and the Congress of Mexico decided that that power of the governor was abrogated by the overthrow of Spanish rule. It was an interpretation of the plan of Iguala, treaty of Cordova and order of October 5, 1821, by the supreme power of Mexico and furnishes us the best means of construction. U. S. v. Sherbeck, 27 Fed. Cas. 16275. Moreover, the language of these acts, the conditions of the country in which they were promulgated, all bear so close an analogy to the principles of the law of nations respecting the laws of conquered or ceded countries as to warrant us in saying that such were their manifest intent and effect. If this be so, the case of More v. Steinbach, 127 U. S. 70-81, in which the court said: "The doctrine invoked by the defendants, that the laws of a conquered or ceded country, except so far as they may affect the political institutions of the new sovereign, remain in force after the conquest or cession until changed by him, does not aid their defense. That doctrine has no application to laws author-

izing the alienation of any portions of the public domain, or to officers charged under the former government with that power. No proceedings affecting the rights of the new sovereign over public property can be taken, except in pursuance of his authority on the subject," is in point and decisive and we so apply it .

In the case of Ely's Administrator v. U. S., supra, relied upon by appellees in this connection does not hold that the validity of the sale in that case depended solely on the power of the officer to make it. On the contrary, it is quite evident from a reading of that case, that, had the validity of the sale depended solely on the power. of the officer to make it, the court would have held it in-valid. Moreover, the decision in Ely's Administrator case was upon facts and under laws bearing no analogy to the case at bar. In that portion of Mexico where the land involved in Ely's Administrator case was situated public lands were sold by intendants of the royal treasury. We know of no law of Spain providing for the sale of land in the Province of New Mexico and the lands in New Mexico which during those times became the subject of private ownership became so by grants, either as re-wards to officials,. or to settlers to encourage industry and the occupation of the country. In that case the land was sold, in this case the land was a gratuitous grant. In that case, the purchase price of the land was received by and retained by the Mexican government and afterwards the sale was ratified and confirmed by a Mexican official whose power and authority to bind the Mexican government the court held to be undoubted; in this case nothing further was done by any Mexican official to confirm and ratify the act of the political chief. Speaking of the subsequent action of the Mexican official who confirmed and ratified the sale in Ely's case and of the extent of his powers, the court said: "When an office is created with such large pow-ers as these and the incumbent thereof reviewing proceed-ings theretofore had by prior representatives of the gov-ernment, and finding that a sale made by one of such prior officers has resulted in the payment of the cash proceeds thereof into the public treasury, confirms his action, ratifies

his proceedings and issues appropriate title papers therefor, it would seem that any doubts which might hang over the power of the prior officer were put at rest, and that thereafter no question could be raised as to the validity of the sale." Ely's Administrator v. United States, supra, p. 233.

Counsel for appellees contend that the fact that the officers of the Mexican government continued to make disposition of the public domain in accordance with the laws of Spain raises a legal presumption in the case at bar that authority to make this grant existed. As sustaining their position on this point counsel cites the cases of United States v. Peralta, 19 How. 347; U. S. v. Arredondo, 6 Pet. 691. In the case of Florida v. Furman, 180 U. S. 402, a suit brought by claimants of a Spanish land grant to remove as clouds from their title, patents issued by the United States to land embraced within the land grant, the court, speaking of the Arredondo and Peralta cases, said : " * * * * it was held in view of the rules of decision presented by the statutes under which the courts exercised jurisdiction, that it was the intention of Congress that a claimant should not be required to offer proof as to the authority of the official executing the grant, but that the court would assume as settled principle that a public grant was to be taken as evidence that it was issued by lawful authority," and that "in Crespin v. United States, 168 U. S. 208, which was a case under the act of 1891, it was held that the presumption indulged in United States v. Arredondo could not supply the want of power in the alleged granting officer." In the case at bar, as we have said, complainants were not proceeding under any act of Congress permitting the United States to be sued, but as at common law, and on the basis of absolute legal title. That title they were obliged to make out and could only avail themselves of such presumptions as would ordinarily obtain."

In the case at bar the appellees seek to bring themselves within the reservations of the act of confirmation. Their position is, that at the time Congress confirmed the Perea grant that the United States had no title to convey. To establish this fact they must prove a perfect title, and

to do that show affirmatively that the officer making  the grant had power to make it.

The Preston Beck and Peralta grants being both void **3** grants owe their validity to the act of Congress confirming them.  Before their confirmation neither had any title or right to the land embraced within their boundaries, so that the act of confirmation cannot relate back, at least, to the date of the acts of the Mexican political chief by which he attempted to make the grants. This point is clearly settled in Dent v. Emmeger, 14 Wall. 308-312, in which the court said: "Titles which were perfect before the cession of the Territory to the United States, continued so afterwards, and were in no wise affected by the change of sovereignty.  The treaty so provided, and such would have been the effect of the principles of the law of nations if the treaty had contained no provision upon the subject. According to that code, a change of government is never permitted to affect pre-existing rights of private property. Perfect titles are as valid under the new government as they were under its predecessor.  But inchoate rights, such as those of Cerro, were of imperfect obligation and affected only the conscience of the new sovereign.  They were not of such a nature (until the sovereign gave them a validity and efficacy which they did not before possess) that a court of law or equity could recognize or enforce them. When confirmed by Congress they became American titles, and took their legal validity wholly from the act of confirmation, and not from any French or Spanish element which entered into their previous existence.  The doctrine of senior or junior equities and of relation back has no application in the jurisprudence of such cases.  The elder confirmee has always a better right than the junior, without reference to the date of the origin of their respective claims or the circumstances attending it.  Such is the settled course of adjudication both by this court and the Supreme Court of Missouri."

The court below held that the Preston Beck grant had priority over the Perea grant, because the claimants of the former grant were first to apply to the surveyor general of New Mexico and secure his confirmation of their claim,

and, "if the confirmatory act and subsequent patent opera-
ted as a deed to convey title from the United States to the
confirmee, they would relate back to the inception of the
proceedings necessary in order to obtain them, which in
this case was the filing of the petition before the surveyor
general. In the cases cited by counsel for the appellees,
the patents or grants related back to the inception of the
right to the patent. In other words, before the patents
issued it had been determined by some intermediary tri-
bunal that the claimant was entitled to a patent, or where
the claimant by virtue of settlement and complying with
the law became entitled to a patent. In all these cases
the claimants before receiving patents had title. The pat-
ent followed as a matter of course. Before it issued the
equitable title was in the claimant, the government hold-
ing the legal title for his benefit. In this case the action
of the surveyor general amounted to nothing at all. Be-
tween his report and the action of Congress the claimant
had no right or title. In the case of Pinkerton v. Ledoux,
129 U. S. 346-351, the court said: "The Surveyor General's
report is no evidence of title or right to possession. His
duties were prescribed by the act of July 22, 1854, before
referred to, and consisted merely in making inquiries and
reporting to Congress for action. If Congress confirmed a
title reported favorably by him it became a valid title; if
not, not. So with regard to the boundaries of a grant;
until his report was confirmed by Congress, it had no ef-
fect to establish such boundaries, or anything else sub-
servient to the title." The act did not even provide for ap-
plications to the surveyor general. It was his duty "under
the instructions of the Interior Department to ascertain
the origin, nature, character and extent of all claims to
lands under the laws, usages and customs of Spain and
Mexico." His instructions from the secretary of the in-
terior were: "You will commence your session by giving
proper notice of the same in a newspaper of the largest
circulation in the English and Spanish languages, and will
make known your readiness to receive notices and testi-
mony in support of the land claims of individuals derived
before the change of government. You will require claim-

ants in every case, and give public notice to that effect, to file a written notice setting forth the name of "present claimant," name of "original claimant," nature of claim, whether inchoate or perfect, its date, from what authority the original title was derived, with a reference to the evidence of the power and authority under which the granting officer may have acted, quantity claimed, locality, notice and extent of conflicting claims, if any, with a reference to the documentary evidence and testimony relied upon to establish the claim and to show a transfer of right from the 'original grantee' to 'present claimant.'" But this order was not effective to give rights which the law did not give. That the powers of the surveyor general of New Mexico and the board of commissioners of California were so dissimilar that the case of Beard v. Federy, 3 Wall. 478. is not in point here is readily seen from the following statement from the case: "After our conquest of California, in 1846, Congress, by act of March 3, 1851, 'to ascertain and settle the private land claims' in that state constituted a board of commissioners, in the nature of a judicial body, before which claims to land there were to be investigated. Every person claiming lands there 'by virtue of any right or title derived from the Spanish or Mexican governments, was to present his claim to this board with the documentary and other evidences of it. Notices of depositions, when taken, were to be given to the law officers of the United States. In case of confirmation of the claim, an appeal was given the United States to the district court; in which case, says the act (Par. 10), that court shall proceed to render judgment upon the pleadings and evidence in the case, and upon such further evidence as may be taken by order of the said court. If the decree in that court was adverse to the government, an appeal was given to this court. The act declares that 'for all claims finally confirmed by the said commissioners or by the district court, or by the supreme court, a patent shall issue to the claimant,' but that such patent shall be 'conclusive between the United States and the said claimants only, and shall not affect the interests of third persons.' It declares, moreover, 'that all lands, the claims to

which shall not have been presented to the said commissioners within two years after the date of the act, shall be deemed, held and considered as part of the public domain of the United States." Speaking of the effect of a decision by the board, the court said: "The board having acquired jurisdiction, the validity of the claim presented, and whether it was entitled to confirmation, were matters for it to determine, and its decision, however erroneous, cannot be collaterally assailed on the ground that it was rendered upon insufficient evidence."

There can be no doubt but that it is the law that "the right to a patent once vested is treated by the government, when dealing with public lands, as equivalent to a patent issued. When, in fact, the patent does issue, it relates back to the inception of the right of the patentee, so far as it may be necessary to cut off intervening rights." Stark v. Starrs, 6 Wall. 402-418. This rule can have no application to the case at bar, because it cannot be said that, either upon the application to the surveyor general or upon his favorable report upon the application, did a right to patent vest.

In the case of Hussman v. Durham, 165 U. S. 144, 145, the court, in discussing the doctrine of relation, says: "A title by relation extends no further backwards than to the inception of the equitable right." In this case the claimants of the Preston Beck grant had no equitable right or title previous to the act of confirmation. This being so, the act of confirmation should not, as to the Preston Beck grant, be given effect by relation as of an earlier date, so as to take priority over the Perea grant. Both are equal in time. The intervener and appellees, holding by the same Act of Congress in so far as their grants conflict or overlap, have each an "equal undivided moiety of the lands within the conflict." Southern Pacific Railroad v. United States, 183 U. S. 519.

For the reasons given the judgment of the lower court will be reversed and the cause remanded for further proceedings in accordance with this opinion, and it is so ordered.

Justices Wright and Roberts, not having been on the bench when this cause was submitted, did not participate in this opinion.

### OPINION ON MOTION FOR REHEARING.

Per Curiam.—In deference to the importance of this case we have heard counsel orally upon the motion for rehearing, thus waiving our rule, which precludes, except by special consent, oral argument upon such matters. The motion proceeds upon two general grounds; first, that the court, in its opinion, has overlooked certain contentions which counsel have presented in their briefs, and second, that certain positions there advanced are incorrectly decided by the court and that the opinion in these respects is contrary to controlling authority. The court has considered the case from each viewpoint. We adhere to the position quite fully outlined in the original opinion, that each of the conflicting Mexican grants was made without authority of law. The question which has, however, chiefly concerned us upon this motion, is whether, even if the grants were originally made without authority, there were other considerations operating in favor of the Beck grant entitling it to priority over the Perea grant. This is to be considered from two standpoints, matters before and matters after the treaty. First, did there exist, at the date of the treaty, by reason of what occurred under the former government, such elements of superiority in the Beck grant, viewed even as an invalid grant, as justifies our considering it prior in right here? It is urged, in this connection, that the giving of juridical possession in 1825 lent the Beck grant a feature of superiority, since in the Perea grant no juridical possession was conferred. We are of opinion, however, that this mere fact would not constitute a circumstance giving priority. If, as we have held, the original action of the granting authorities was invalid because not characterized by the power to pass the title, much more so is the act of an alcalde viewed as an attempt to the same end. The alcalde, of course, had no power to initiate a grant on behalf of the sovereignty (Hays v. United States, 175 U. S. 248). We think it is

equally clear that if he gave possession pursuant to a void grant, no more dignity could flow from this latter circumstance than from a situation in which he attempted to give possession upon his own initiative and upon his own claim of power.

It is next argued, and with great force, that, discarding the matter of juridical possession as an element of title, and discarding the acts of the granting authorities as efficacious to pass title, still, under the case of Pino v. Hatch, 1 N. M. 125, 130, citing Pollard's Lessees v. Files, 2 How. 591-3, the acts of the granting officers invested the grantees with at least the right of possession for such time as the sovereign might permit them to stay there, in other words, a permissive possession tantamount to a license to occupy. It is said that as this existed in behalf of the Beck grantees, it constituted a feature of advantage and superiority which that grant possessed at the time of the treaty. We note, however, that the petition for the Perea grant, made after the Beck grant, recites possession and upon that an order made favorable to the petition was made by authorities claiming to have power to pass title, so that if we are to impute a permissive possession from the Beck grant, we must likewise impute a permissive possession from the Perea grant. We recognize, however, as between these two, the difference that in the Beck grant there was juridical possession and in the Perea grant there was not. However, we think that if this doctrine is to be invoked, there is much to be said in support of the view that it operates in favor of the Perea grantees, as well as the Beck grantees. We, however, are of the opinion that, irrespective of this, the most that can be said in behalf of the Beck grant, under Pino v. Hatch, is that when the treaty came to be signed there was a license to occupy in favor of the Beck grantees. We do not commit ourselves to that position, but we say that the most that can be claimed under Pino v. Hatch is that that existed. Now, if that did exist, we are of opinion that under the case of Zia v. United States, 168 U. S. 198, this license or permissive possession was revoked ipso facto by the treaty and when the treaty was signed these

properties passed to the United States as public domain to be dealt with by Congress and that Congress did deal with them on the same day by the same act, granting the premises here involved to two distinct parties represented by the two interests now before the court. It is next said, however, that these were circumstances subsequent to the treaty which create a superiority in favor of the Beck grant. We have, in the original opinion, dealt with the contention that the filing of the Beck petition first before the surveyor general created an element of superiority. We have held that it did not and that the doctrine of relation had no application. We adhere to that view. The Act of 1854, which authorized the presentation of these petitions to the surveyor general, placed no time limit thereon. It invited all parties to come and present them for the consideration of the surveyor general, to be transmitted by him to Congress for its action. We think, therefore, that to hold that the mere circumstance that one claimant reached the Surveyor-General's office first in order to present his claim cannot be considered as affecting the rights of other parties, who, perhaps equally diligent, but farther removed geographically, may have presented theirs the next day, or the next week. Such a rule as is here insisted upon, in our judgment, would have meant that a petitioner living in Santa Fe and filing his claim immediately would have rights superior by that very fact to a claimant filing his claim seasonably, although later. We do not think that result can exist and this is illustrative of where counsel's contention would lead us under the system created by the act of 1854. We have, however, considered this in the original opinion.

The other point urged, and one which it is insisted we have overlooked in the opinion, is that the survey of the Beck grant was first made and that it operated as such a segregation of the land from the public domain as made any attempt to survey it under the Perea grant futile, and that the circumstance that the survey was first made of the Beck grant thus gave that an element of superiority. We are unable to accede to that view. We think that the time when a survey would be made was so much a matter in the

hands of executive or administrative officers that the mere fact that a contract may have been first let for the Beck grant, due, perhaps, to inherent difficulties in the survey of the other, or other purely accidental circumstances, could not operate to render nugatory an act of Congress which confirmed equally to the Perea grant and to the Beck grant the interest of the government in the lands involved. Upon consideration, therefore, of this second matter, we do not find any circumstance which leads us to adjudge the Beck grant superior in point of time. Our judgment, therefore, on this motion is that the original opinion must be adhered to, and that will be the order of the court.

This view of the law being conclusive of the cause and it being stipulated by counsel that there shall be a final judgment in this court pursuant to the court's opinion, rather than a remanding of the cause to the trial court, the Clerk will enter a judgment in this court declaring the rights of the respective parties to be the ownership of an undivided moiety in the overlap between the Beck and Perea grants. Counsel may prepare a judgment in accordance herewith.

WILLIAM H. POPE,
Chief Justice.